**2020 UT App 162**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DARRIN JAMES GALLEGOS,
Appellant.

Opinion
No. 20190029-CA
Filed December 10, 2020

Third District Court, Salt Lake Department
The Honorable Elizabeth Hruby-Mills
No. 181901242

Sarah J. Carlquist and Brady Smith,
Attorneys for Appellant

Sean D. Reyes, John J. Nielsen, and Richard Pehrson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGE KATE APPLEBY concurred. JUDGE JILL M. POHLMAN
concurred in part and dissented in part, with opinion.

HARRIS, Judge:

¶1      After searching the prison cell Darrin James Gallegos shared with a cellmate (Cellmate), guards found a shank hidden in a shoe. At first, Gallegos and Cellmate agreed that the shank belonged to Gallegos. But a few months later, after criminal charges were filed against Gallegos, they changed their stories and insisted the shank belonged to Cellmate. A jury later convicted Gallegos of possession of a dangerous weapon by a restricted person, a first-degree felony. Gallegos now appeals that conviction, and challenges the trial court's admission of three pieces of evidence: Gallegos's previous possession of a similar shank, Gallegos's and Cellmate's affiliation in gangs, and

Gallegos's and Cellmate's sentences and parole statuses. Under the circumstances, the trial court did not abuse its discretion by admitting the gang evidence or evidence about their sentences and parole statuses at the time the shank was discovered. But evidence about the potential sentence Gallegos faced if convicted at trial should not have been admitted and, most significantly, we conclude that the trial court improperly allowed the jury to learn that Gallegos had previously possessed a similar shank. And we are persuaded that admission of the previous shank evidence, in particular, was not harmless. Accordingly, we reverse Gallegos's conviction and remand for a new trial.

BACKGROUND

¶2     Gallegos is an inmate at the Utah State Prison, and for a time he shared a cell with Cellmate. One day, prison officials were searching prisoners' cells for contraband. While searching the cell shared by Gallegos and Cellmate, officers discovered a "homemade weapon," or "shank," located in an Adidas brand shoe. The shoe was located in a common area of the cell, on the floor between the two bunks and the toilet. The weapon was a nine-inch "piece of steel" cut from the frame of a bunk bed and "sharpened . . . into a point" on one end.

¶3     After finding the shank, officers asked Gallegos and Cellmate "if either one of them wanted to claim ownership," and both initially denied knowing anything about it. Later that day, however, Gallegos admitted to one officer that the shank was his, and a few weeks later made the same admission to a different officer during a follow-up interview. The prison held separate internal disciplinary hearings about the incident for both Gallegos and Cellmate, and each of them stated, at their hearings, that the shank belonged to Gallegos, and that he would "accept accountability" for it. As a result, prison officials dismissed all internal disciplinary charges against Cellmate.

¶4 The State then filed a criminal charge against Gallegos, accusing him of one first-degree-felony count of possession of a dangerous weapon by a restricted person.[1] After that criminal charge was filed, Gallegos and Cellmate each changed their stories, and claimed that the shank had actually belonged to Cellmate, not to Gallegos. In recorded phone calls made from prison, Gallegos explained to a listener that he had originally claimed ownership of the shank because the likely internal prison punishment would be a fine, which did not matter to Gallegos because his prison account (referred to as his "books") was already so burdened with other fines and restitution that he had stopped using it. Cellmate's books, on the other hand, were clear, and Cellmate had been allowing Gallegos to use his prison account for deposits and purchases. If Cellmate were to be fined, it would have made using his prison account much more difficult for each of them. Moreover, Cellmate also testified that, at the time, he had just received his "level three" eligibility to be moved from the maximum-security section of the prison to general "population," and if the shank were determined to be his, he would have had to remain in maximum security.

---

1. Under Utah law, possession of a weapon by a restricted person is a crime that can be charged as anything from a class A misdemeanor up to a first-degree felony, depending on the type of weapon involved and on various other factors, including the defendant's criminal history. Gallegos is a "Category I restricted person" because of his criminal history, and was charged under a statute mandating that the crime of which he was accused was a "third-degree felony." *See* Utah Code Ann. § 76-10-503(2)(b) (LexisNexis 2017). However, the State also alleged that Gallegos was a "habitual violent offender," a status that raises the penalty for a third-degree felony to that of a first-degree felony. *See id.* § 76-3-203.5(2)(a). On appeal, Gallegos does not take issue with the State's position regarding the severity of the charged offense.

¶5      As the case proceeded toward trial, the State made motions asking the trial court to admit three types of evidence. First, the State wanted to introduce evidence that, over four years earlier, Gallegos had been found to be in possession of a similar shank, also cut from the frame of a bunk bed—evidence the State considered relevant to the question of who possessed the shank on this occasion. Second, the State sought permission to inform the jury that Gallegos and Cellmate were members of affiliated gangs, and would therefore be more likely to protect each other. Third, the State intended to introduce evidence that Cellmate was in prison for murder and was serving a sentence of life without the possibility of parole (LWOP), while Gallegos, by contrast, was not only eligible for parole but, at the time the shank was discovered, had a parole hearing coming up. The State asserted that these last two categories of evidence were relevant to show why Gallegos and Cellmate would have changed their stories about ownership of the shank. Gallegos opposed the motions, asserting that the evidence about his previous shank possession was improper under rule 404(b) of the Utah Rules of Evidence, and that all of the evidence was unduly prejudicial under rule 403.

¶6      After briefing and argument, the trial court granted the State's motions, and allowed the State to introduce all three types of evidence. The court offered to give a limiting instruction regarding the gang evidence and the parole status evidence, but Gallegos declined that offer. Gallegos did seek, and the court gave, a limiting instruction regarding Gallegos's possession of a shank on a previous occasion, instructing the jury that it could consider Gallegos's possession of a previous shank,

> if at all, for the limited purpose of: [considering] [w]hether there was a sufficient nexus (relationship) between [Gallegos] and the weapon . . . for you to determine that [Gallegos] had both the power and intent to exercise dominion and

> control over any allegedly dangerous weapon in
> this case. This evidence is not admitted to prove a
> character trait of [Gallegos] or to show that he
> acted in a manner consistent with such a trait. Keep
> in mind that [Gallegos] is on trial for the crimes
> charged in this case, and for those crimes only. You
> may not convict a person simply because you
> believe [he] may have committed some other acts
> at another time.

¶7    At trial, the State called several witnesses during its case-in-chief, all of whom were officers or investigators affiliated with the prison. The officers who found the shank in the shoe testified, as did a different officer who found a similar shank in Gallegos's possession more than four years earlier. The State also called a prison investigator who specializes in gangs, who testified about the specific affiliated gangs to which Gallegos and Cellmate belonged, and that members of these gangs have a duty to "have some sort of weapon" and to be ready to defend other gang members. The investigator also testified that fellow gang members sometimes agree to take charges for one another, particularly where a charge would mean a harsher sentence for one gang member as opposed to another. In connection with this testimony, the State introduced evidence of Gallegos's and Cellmate's tattoos to establish their gang affiliations.

¶8    A different prison investigator testified about recorded phone calls Gallegos made from the prison, as well as about Gallegos's and Cellmate's prison accounts and parole statuses. With regard to parole status, the investigator testified that Cellmate was serving a LWOP sentence and had no possibility of being paroled, but that Gallegos, by contrast, was eligible for parole and "in theory" could be paroled at any time. Indeed, the investigator noted that, at one point, Gallegos had a parole hearing scheduled for a date ten months after the shank was discovered, and that his parole status could "depend in part on

his conduct while in prison." In connection with this evidence, the jury heard Gallegos (on a recorded phone call) mention that he was facing "five-to-life" in this case. Although the State made no further mention of the potential sentence Gallegos might receive if convicted, Gallegos's attorney mentioned the issue in cross-examination and in closing argument, implying that five years to life was an overly long and unjust sentence for being caught with a shank in a shoe.

¶9      Gallegos elected not to testify, but he called Cellmate, who testified that both the Adidas shoes and the shank were his, and did not belong to Gallegos; he even described in some detail the manner in which he had cut the shank from the bed frame. Cellmate also testified that, like Gallegos, he had been caught with a shank on one previous occasion, before he shared a cell with Gallegos; in his case, the previous episode occurred about a year before the shank was discovered in their shared cell.

¶10     After deliberation, the jury convicted Gallegos of possessing the shank. Outside the presence of the jury, the trial court found that Gallegos was a restricted person and a habitual violent offender, and that Gallegos therefore was guilty of a first-degree felony. The court later sentenced Gallegos to prison for five years to life, to run consecutive to the sentence he was already serving.

ISSUE AND STANDARD OF REVIEW

¶11     Gallegos appeals, challenging the trial court's admission of the three types of evidence discussed above. We review for abuse of discretion the court's decision to admit this evidence. *See Met v. State*, 2016 UT 51, ¶ 96, 388 P.3d 447 (stating that a trial court's decision to admit evidence pursuant to rule 403 is reviewed for abuse of discretion, which occurs when the court "applies the wrong legal standard or its decision is beyond the limits of reasonability" (quotation simplified)); *see also State v.*

*Allen*, 2005 UT 11, ¶ 15, 108 P.3d 730 ("When examining a [trial] court's decision to admit evidence under Utah Rule of Evidence 404(b), we review for an abuse of discretion.").

ANALYSIS

I

¶12    Gallegos first challenges the trial court's decision to allow the State to introduce evidence that, on a prior occasion some four years before the incident in question, Gallegos possessed a similar prison shank, also cut from a bedframe.

¶13    Rule 404(b)(1) of the Utah Rules of Evidence prohibits the introduction of evidence "of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." *Accord State v. Lopez*, 2018 UT 5, ¶ 38, 417 P.3d 116. This subsection of the rule "recognizes the dangers of exposing a jury to evidence of a defendant's acts of prior misconduct—specifically, the risk that the jury will infer that the defendant has a reprehensible character, that he probably acted in conformity with it, and that he should be punished for his immoral character in any event." *State v. Thornton*, 2017 UT 9, ¶ 35, 391 P.3d 1016 (quotation simplified). This forbidden line of thinking is sometimes referred to as a "propensity inference"—that is, if jurors are told that a person has acted in a certain way on previous occasions, they may conclude that it is in that person's character to act that way, and may conclude that, due to this propensity, the person was much more likely to have acted in conformity with that propensity on the occasion in question. *See, e.g.*, *State v. Lucero*, 2014 UT 15, ¶ 14, 328 P.3d 841 (referring to the "propensity inference" (quotation simplified)), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *accord State v. Verde*, 2012 UT 60, ¶ 39, 296 P.3d 673, *abrogated on*

*other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Our supreme court has referred to the propensity inference as "improper," *Lucero*, 2014 UT 15, ¶ 14, and "impermissible," *Verde*, 2012 UT 60, ¶ 39; *see also id.* ¶ 15 (stating that, when prior acts evidence "is offered to suggest action in conformity with a person's alleged bad character, it is inadmissible").

¶14 But while evidence of a defendant's other bad acts is not admissible under rule 404(b) to prove propensity, that rule allows admission of evidence of such acts for other purposes. The rule provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See* Utah R. Evid. 404(b)(2). Thus, "when past misconduct evidence is offered for any other purpose—other than to suggest action in conformity with the bad character suggested by [a defendant's] prior bad acts—such evidence is admissible so long as it satisfies rules 402 and 403." *See Thornton*, 2017 UT 9, ¶ 36 (quotation simplified).

¶15 Our supreme court has distilled these principles into a three-part test that governs admissibility of other-bad-acts evidence pursuant to rule 404(b)(2). "Such evidence is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value." *State v. Killpack*, 2008 UT 49, ¶ 45, 191 P.3d 17 (quotation simplified); *see also Lucero*, 2014 UT 15, ¶ 37 (instructing "trial courts to engage in a three-part analysis under rules 404(b), 402, and 403").

¶16 The first step in this analysis requires that the evidence be relevant, as that term is used in rules 401 and 402. But this test presents "a low bar," *see Thornton*, 2017 UT 9, ¶ 61, because "[e]vidence is relevant if . . . it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Utah R. Evid. 401. On appeal, Gallegos does not

contend that the court abused its discretion by determining that the evidence regarding the previous shank was relevant.

¶17 Gallegos does, however, challenge the trial court's conclusions that the remaining two parts of the test were met here. First, he challenges the court's determination that the previous shank evidence was admitted for a proper, non-propensity purpose. Second, he challenges the court's rule 403 determination that the probative value of the previous shank evidence was not substantially outweighed by the risk of unfair prejudice. In summary, Gallegos asserts that both rule 404(b) and rule 403 require exclusion of this evidence. We discuss the applicability of each rule, in turn, and conclude that, even if the court's admission of the evidence did not violate rule 404(b), it did violate rule 403.

A

¶18 Under the second step of the test, the proponent of the prior acts evidence must demonstrate that the evidence is being admitted for a proper, non-propensity purpose. Here, the State asserts that the prior shank evidence is relevant to link Gallegos to the present shank, and helps demonstrate that he at least constructively possessed it.[2] As the State puts it, "[a]t issue here is the relevance of prior possession to show current possession."

---

2. "Constructive possession is a legal fiction whereby a person is deemed to possess contraband even when he [or she] does not actually have immediate physical control of the object." *See United States v. Schmitt*, 770 F.3d 524, 534 (7th Cir. 2014) (quotation simplified); *see also Constructive Possession*, Black's Law Dictionary (11th ed. 2019) (defining "constructive possession" as "[c]ontrol or dominion over a property without actual possession or custody of it").

¶19   To prove that Gallegos at least constructively possessed the shank, the State must "prove that there was a sufficient nexus between the accused and the [contraband] to permit an inference that the accused had both the power and the intent to exercise dominion and control over" the contraband. *See State v. Workman*, 2005 UT 66, ¶ 31, 122 P.3d 639 (quotation simplified). Whether a "sufficient nexus" exists "depends upon the facts and circumstances of each case." *Id.* (quotation simplified); *see also State v. Fox*, 709 P.2d 316, 319 (Utah 1985) (stating that "the determination that someone has constructive possession of drugs is a factual determination which turns on the particular circumstances of the case"). And our supreme court, in a series of drug cases, has identified "[s]everal factors [that] may be important" in evaluating constructive possession, including the following: (a) ownership or occupancy of the residence or vehicle where the drugs were found; (b) the presence of the defendant at the time the drugs were found; (c) the defendant's proximity to the drugs; (d) "previous drug use"; (e) whether the defendant made incriminating statements or exhibited incriminating behavior; and (f) the presence of drugs in a specific area where the defendant had control. *See Workman*, 2005 UT 66, ¶ 32; *see also Fox*, 709 P.2d at 319 (listing factors); *State v. Anderton*, 668 P.2d 1258, 1264 (Utah 1983) (Durham, J., concurring majority) (same). But the court has also cautioned against rigid reliance on a list of factors in evaluating constructive possession, since such factors are "particularly relevant to the specific factual context in which those cases arose," and are not necessarily "universally pertinent factors," nor are they "legal elements of constructive possession in any context." *See State v. Layman*, 1999 UT 79, ¶ 14, 985 P.2d 911.

¶20   Our supreme court has applied this test rather narrowly. In particular, there are several things relevant here that our supreme court has never done. First, in discussing the "previous drug use" factor in its constructive possession test, our supreme court has never analyzed the propensity implication that factor

seems to invite. Second, that court has never phrased the "previous use" factor in terms of "previous possession"; rather, it has always spoken in terms of "use." *See Workman*, 2005 UT 66, ¶ 32 (stating that "previous drug use" was a factor that could be considered); *Anderton*, 668 P.2d at 1264. Indeed, in *Anderton*, the relevance of the use factor was limited to "use and enjoyment" of the drugs in question in the case, and not prior use of other drugs. *See* 668 P.2d at 1264 (listing the defendant's "participati[on] with others in the mutual use and enjoyment of the contraband" as a factor that could be considered (quotation simplified)). And third, the parties direct our attention to no case in which our supreme court has applied these factors generally, or the "previous use" factor specifically, to establish constructive possession in any non-drug case. As Gallegos points out, there may be reasons why one might consider previous use more relevant to constructive possession—and perhaps somewhat less related to a forbidden propensity inference—in drug cases than in other types of cases.

¶21　But unlike our supreme court, we have extended the previous use concept to non-drug cases, and—also without analyzing the applicability of rule 404(b)—we have even stated that "previous possession of similar contraband by the defendant" is relevant to show that the defendant had at least constructive possession of contraband in the later incident. *See State v. Lucero*, 2015 UT App 120, ¶ 7, 350 P.3d 237 (case involving drugs and weapons); *see also State v. Clark*, 2015 UT App 289, ¶ 20, 363 P.3d 544 (stating in a case involving stolen identification that "previous possession of similar contraband" is a "factor that may support a finding of constructive possession" (quotation simplified)). And some federal cases, applying the federal version of rule 404(b), have employed similar analyses in cases involving illegal possession of firearms. *See, e.g., United States v. Moran*, 503 F.3d 1135, 1144 (10th Cir. 2007) (holding that evidence that the defendant previously possessed a similar firearm was "probative to demonstrate that [he] knowingly

possessed the firearm" in question (quotation simplified)); *United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002) (stating that "where a defendant is charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to his knowledge and intent with regard to the crime charged" (quotation simplified)).

¶22    While we can certainly appreciate that a defendant's prior possession of a firearm is relevant to demonstrating that he constructively possessed a similar firearm on a later occasion, it appears to us that the main reason such evidence is relevant for that purpose is that it demonstrates propensity—that the defendant's previous possession of weapons may indicate a propensity to possess weapons, and may indicate that the defendant acted in conformity with that propensity and possessed another weapon on a later occasion. There is no question that propensity evidence has relevance. *See State v. Murphy*, 2019 UT App 64, ¶ 47, 441 P.3d 787 (Harris, J., concurring) (stating that propensity evidence "is excluded not because it has no probative value but because it has too much" (quotation simplified)). But "[f]idelity to the integrity of the rule requires a careful evaluation of the true—and predominant—purpose of any evidence proffered under rule 404(b)." *See Verde*, 2012 UT 60, ¶ 22. And after reviewing the parties' briefs and relevant case law, we find it difficult to discern a separate *non-propensity* reason why evidence that Gallegos previously possessed a similar shank makes it more likely that he constructively possessed a shank on a later occasion.

¶23    In an attempt to demonstrate a proper non-propensity purpose, the State asserts that Gallegos's previous possession of a similar shank was relevant to show his "knowledge of" and his "motive and intent to possess" the second shank. Thus, the State invokes three of the reasons listed in rule 404(b)(2) as potentially valid non-propensity purposes for admission of prior acts evidence: knowledge, motive, and intent. In addition, the State

phrased its argument differently—and more philosophically—at oral argument, asserting that the prior acts evidence was not character evidence at all, because it was not intended to say anything about who Gallegos was as a person, but instead was intended merely to inform the jury of certain acts he had committed. We discuss each of these arguments, in turn.

1

¶24 To be sure, "knowledge" can be a proper non-character purpose under rule 404(b). Not only is knowledge identified in the text of the rule as one of the enumerated permissible purposes, *see* Utah R. Evid. 404(b)(2), we have also previously held that, in appropriate cases, prior bad acts evidence can come in to prove a defendant's knowledge in the case at hand, *see, e.g.*, *State v. McDonald*, 2005 UT App 86, ¶ 12, 110 P.3d 149. But it is insufficient for the proponent of prior bad acts evidence merely to incant the word "knowledge"; instead, in order to analyze whether knowledge is a proper non-character purpose, rather than just shorthand for a propensity inference, we must know more about what type of knowledge the evidence tends to show in a particular case.

¶25 In some cases, evidence of prior bad acts can help demonstrate that a defendant has the requisite state of mind for conviction—that he knew that his actions were unlawful or likely to result in injury. In *McDonald*, for instance, the defendant was accused of cruelty to animals, a charge resulting from the defendant keeping fifty-eight cats in an unventilated, enclosed trailer. 2005 UT App 86, ¶¶ 2–6. In order to convict the defendant, the State was required to prove that she acted "intentionally, knowingly, recklessly, or with criminal negligence." *See* Utah Code Ann. § 76-9-301(2) (2003). To prove the defendant's state of mind, the State presented evidence that she had, on a previous occasion, possessed some fifty cats, and that she had been warned by animal control officers at the time

that "keeping multiple cats in a confined area for too long a time could cause sickness or injury to the cats." *McDonald*, 2005 UT App 86, ¶ 11. We held that the court did not abuse its discretion by admitting the prior acts evidence, because it helped "establish [the defendant's] knowledge that her conduct was likely to result in sickness or injury to the cats that she was confining," and therefore the evidence went "directly towards proving [the defendant's] state of mind" in confining the cats. *Id.* ¶ 12. Thus, the prior acts evidence was used primarily to demonstrate the defendant's knowledge that her actions were likely to result in injury to the animals, rather than to show that she was the type of person who would act cruelly toward animals. *Id.*; *see also State v. Rackham*, 2016 UT App 167, ¶ 17, 381 P.3d 1161 (evidence of the defendant's "previous experience with his young cousins and nieces becoming alarmed or affronted by his unwanted touching" was relevant to demonstrate the defendant's knowledge that such touching would be unwelcome).

¶26     In other cases, where a defendant contends that he could not have committed the crime because he does not possess certain knowledge necessary to its commission, some courts have concluded that evidence of prior bad acts can be admitted to refute that contention. *See, e.g.*, *United States v. Miller*, 673 F.3d 688, 698 (7th Cir. 2012) (stating that evidence of prior cocaine possession might be relevant to prove knowledge in a case where the defendant asserted that "he lacked knowledge of cocaine or how to sell it"); *United States v. Mendoza*, 341 F.3d 687, 692 (8th Cir. 2003) (holding that, where the defendant argued that "he was just along for the ride and did not even know how much an ounce of methamphetamine was," evidence of his prior conviction for methamphetamine possession was admissible). *But see Dean v. State*, 865 P.2d 601, 608 (Wyo. 1993) (stating that "knowledge of how to commit the crime is not the knowledge Rule 404(b) permits the admission of prior bad acts to prove"), *abrogated on other grounds as recognized by Williams v. State*, 99 P.3d 432 (Wyo. 2004). As applied to this situation, had Gallegos

defended the case by asserting that he did not know how to cut a shank from a bed frame and therefore the shank could not have been his, evidence of his prior shank possession arguably would have been relevant for a non-propensity knowledge-based purpose: to rebut the contention that Gallegos did not know how to make a shank from a bed frame.

¶27    In this case, however, the State does not claim to have offered the prior bad acts evidence to demonstrate either of these types of knowledge. Gallegos did not defend the case by asserting that he lacked knowledge about how to make a shank, and Gallegos's state of mind (that is, whether he acted with intent, knowledge, recklessness, or negligence) was never the issue. Instead, the State asserts that the prior bad acts evidence is relevant to the constructive possession issue because it tends to show that Gallegos had "knowledge of . . . the shank" on this occasion. But under these circumstances, given Gallegos's defenses and the relevant issues at trial, we fail to see how Gallegos's possession of a shank on a previous occasion helps demonstrate Gallegos's "knowledge of" the shank in question, other than through a propensity inference.[3] *See Verde*, 2012 UT

---

3. One federal court examining this issue in a similar case acknowledged that admitting evidence of a prior instance of weapons possession "to prove knowledge" for constructive possession purposes on a later occasion "involves a kind of propensity inference (i.e., because [the defendant] knowingly possessed a firearm in the past, he knowingly possessed the firearm in the present case)." *See United States v. Moran*, 503 F.3d 1135, 1145 (10th Cir. 2007). In that case, the court admitted the evidence nonetheless, but did so using a probability theory similar to the doctrine of chances. *See id.* (stating that the prior acts evidence could be admitted for the purposes of supporting an inference resting "on a logic of improbability that recognizes that a prior act involving the same knowledge decreases the

(continued…)

60, ¶ 26 ("In context, it seems much more likely that [the evidence] was aimed at sustaining an impermissible inference that [the defendant] acted in conformity with the bad character suggested by his prior bad acts."). We are therefore unconvinced that "knowledge" can supply a proper non-character purpose for admission of the prior bad acts evidence under the circumstances presented here.

2

¶28 In addition to knowledge, the State also argued that evidence of Gallegos's prior shank possession should be admissible to show his "motive" to possess the current shank. Motive is one of the reasons listed in rule 404(b)(2) that might serve to justify admission of prior bad acts evidence, *see* Utah R. Evid. 404(b)(2), and we have recognized its applicability in some cases, *see State v. Losee*, 2012 UT App 213, ¶¶ 18–19, 283 P.3d 1055 (affirming the admission of evidence of a previous assault, because it explained why the defendant might have had a motive to solicit the murder of the victim of the original assault).

---

(…continued)
likelihood that the defendant lacked the requisite knowledge in committing the charged offense"); *see also State v. Verde*, 2012 UT 60, ¶¶ 47–51, 296 P.3d 673 (describing the doctrine of chances), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. While the doctrine of chances was among the grounds the State invoked when seeking admission of the prior shank incident before the trial court, that court made no ruling regarding the applicability of the doctrine of chances, and on appeal the State does not ask us to affirm the court's admission of the shank evidence pursuant to the doctrine of chances; we therefore do not address whether that doctrine might apply here.

¶29    In this case, however, Gallegos's motive was never in question. Gallegos was a maximum-security prisoner at the Utah State Prison, and was a member of a prison gang that demanded loyalty of its members, including a duty to "have some sort of weapon" and to be ready to defend other gang members. Nothing in the record suggests that there was any mystery about why Gallegos might have wanted to possess a prison shank, and he did not argue he lacked a motive to possess one.

¶30    And the State's reference to "motive" in its briefing is fleeting, and unaccompanied by any explanation of how the prior acts evidence would have materially added to the jury's perception of what Gallegos's motive might have been, beyond the already-obvious evidence of motive, and other than asking the jury to draw a propensity inference. We are therefore unpersuaded that "motive" can provide a proper non-character purpose for admission of the prior bad acts evidence in this case.

3

¶31    Next, the State asserts that evidence of Gallegos's prior shank possession should be admissible to show his "intent to possess the shank discovered in his shared cell." "Intent" is another of the purposes specifically listed in rule 404(b)(2), *see* Utah R. Evid. 404(b)(2), and we have recognized its applicability in appropriate cases, *see State v. Von Niederhausern*, 2018 UT App 149, ¶ 19, 427 P.3d 1277 ("Evidence is offered for a proper noncharacter purpose if used to prove intent."). Moreover, as the State emphasizes, the touchstone of our supreme court's constructive possession test is whether the defendant "had both the power and the intent to exercise dominion and control over" the contraband. *See State v. Workman*, 2005 UT 66, ¶ 31, 122 P.3d 639 (quotation simplified). The State therefore contends that evidence of Gallegos's previous shank possession is admissible to show Gallegos's intent to possess the shank on this occasion.

¶32    As discussed above, however, Gallegos's intent—in a mens rea[4] sense—was never at issue in the case. Gallegos's defense rested on the assertion that the shank was not his, but Cellmate's; his argument was that he did not possess the shank at all, not that he possessed the shank with less-than-criminal intent. This is distinct from many other "intent" cases. *See, e.g., State v. Widdison*, 2001 UT 60, ¶ 45, 28 P.3d 1278 (affirming the admission of previous acts of child abuse to show the "intent and mental state" of the defendant when she committed the abusive acts of which she was accused); *State v. Vu*, 2017 UT App 179, ¶ 19, 405 P.3d 879 (affirming the admission of prior acts of methamphetamine sales to demonstrate that the defendant likely intended to sell, rather than use himself, the distributable amount of methamphetamine with which he was found).

¶33    In this case, the only way in which "intent" is relevant is as a part of the constructive possession test—whether Gallegos had the "intent to exercise dominion and control over" the shank in question. *See Workman*, 2005 UT 66, ¶ 31 (quotation simplified). But in this context, "intent" refers simply to possession. The State seeks to admit the evidence to demonstrate that, because Gallegos once possessed a shank on a previous occasion, it is more likely that he had "intent to" possess one on this occasion. But this boils down to nothing more than a propensity inference.

¶34    Without question, the State had to prove that Gallegos constructively possessed the shank, and as part of that inquiry had to show that Gallegos had the "intent to exercise dominion

---

4. Mens rea is "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime," and "is the second of two essential elements of every crime at common law, the other being the actus reus." *Mens rea*, Black's Law Dictionary (11th ed. 2019).

and control over" it. *See id.* (quotation simplified). But, as our supreme court has noted,

> the technical relevance of a defendant's intent is not enough to justify the admissibility of evidence of prior bad acts purportedly aimed at establishing intent under rule 404(b). Fidelity to the integrity of the rule requires a careful evaluation of the true—and predominant—purpose of any evidence proffered under rule 404(b). Thus, if proof of intent is merely a ruse, and the real effect of prior misconduct evidence is to suggest a defendant's action in conformity with alleged bad character, the ruse is insufficient and the evidence should not be admitted.

*Verde*, 2012 UT 60, ¶ 22 (quotation simplified). While the prior bad acts evidence here may be technically relevant to show intent to possess under *Workman*, we are unable to discern a non-propensity pathway through which that evidence helps prove intent to possess. We are thus unpersuaded that "intent" provides a proper non-character purpose for admission of evidence that Gallegos previously possessed a shank.

4

¶35    Finally, at oral argument before this court, the State took a slightly different tack, asserting that, in this context, there is a difference between "who a person is" and "what a person did," and that rule 404(b) only bars evidence of the former—that is, it bars evidence of a person's negative character, and does not necessarily bar evidence of a person's prior bad acts insofar as that evidence does not bear on the essence of the person's character. Specifically, the State argued that, in this case, the evidence of prior shank possession was not intended to show that Gallegos was a bad person generally, just that he was a person "with a certain level of knowledge or a certain motive,

[and] therefore . . . likely had that motive or that knowledge in this instance." The State argued that the rule excludes propensity evidence only when a prosecutor "add[s] an extra step there and say[s], 'somebody did something bad, therefore they are a bad person, therefore on this occasion they did something bad.'" In essence, "the State's view is that you can show that somebody had intent on a prior occasion and therefore they had intent on this occasion without saying anything about who they are."

¶36 We acknowledge the structure of rule 404(b), which forbids introduction of "[e]vidence of a crime, wrong or other act" for the purpose of proving "a person's character in order to show that on a particular occasion the person acted in conformity with that character," yet allows introduction of prior bad acts evidence for other purposes, including "proving motive, . . . intent, . . . [or] knowledge." *See* Utah R. Evid. 404(b)(1)–(2). But the term "character," as used in rule 404(b), is broader than the State suggests. The term as used there means more than whether the person is, at root, a generally good-hearted person with positive qualities; rather, the term is also intended to encompass specific traits or propensities the person might have, some of which might be negative even if the person could be considered generally a good person. Indeed, the rules of evidence themselves make clear that there is more than one way to prove a person's "character": in addition to offering evidence of the person's general reputation in the community, in certain instances litigants may prove character by offering "relevant specific instances of the person's conduct." *See* Utah R. Evid. 405; *see also* David P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 1.2 (2009) (stating that character evidence includes "evidence of other wrongful acts"). That is, evidence of specific acts, even if not presented as evidence of a person's general character, can lead a factfinder to draw inferences about a person's propensities, and therefrom to infer that the person may have acted in conformity with those propensities.

¶37 Our supreme court has noted that the ban on propensity evidence is also concerned with evidence of specific behavior, and not just evidence of general character, because evidence of specific behavior can lead to inferences about broader character traits. *See, e.g.*, *State v. S.H.*, 2002 UT 118, ¶ 24, 62 P.3d 444 (stating that the ban on propensity evidence works "to ensure that a defendant is only convicted because he committed the charged offense and not because the jury is convinced of his cumulative bad *behavior*" (emphasis added)). Indeed, rule 404(b)'s restrictions on evidence of prior bad acts are in place precisely because of the concern that juries might infer from such evidence that a defendant has a negative character trait and might have acted in conformity therewith. *See State v. Thornton*, 2017 UT 9, ¶ 35, 391 P.3d 1016 (stating that rule 404(b) "recognizes the dangers of exposing a jury to evidence of a defendant's acts of prior misconduct—specifically, the risk that the jury will infer that the defendant has a reprehensible character [and] that he probably acted in conformity with it" (quotation simplified)); *Verde*, 2012 UT 60, ¶ 26 (stating that the propensity ban is concerned with juries drawing "an impermissible inference that [the defendant] acted in conformity with the bad character suggested by his prior bad acts").

¶38 Thus, rule 404's ban on character evidence includes more than just a ban on evidence tending to show that a person possesses a generally bad character—is a "bad person"—and acted in conformity with that bad character; it also includes a ban on evidence tending to show that a person—who might otherwise be a good person—has a specific negative character trait (or propensity) and acted in conformity with that trait. Evidence does not have to impugn a person's entire character in order to fall within the ambit of the propensity ban.

¶39 Applying these principles to this case, we take the State at its word when it asserts that it did not offer the evidence of Gallegos's prior shank possession in an effort to prove that

Gallegos is a bad person. But that evidence surely did raise the inference that Gallegos—who might otherwise be a good person—might be a person who has a propensity for making and keeping prison shanks while incarcerated, and that he might have acted in conformity with that propensity in this case. Such an inference is forbidden, despite the fact that it may not say anything about Gallegos's character generally.

¶40    In the end, we remain unpersuaded that a proper non-character purpose existed to support the admission of evidence that Gallegos possessed a different shank years earlier. Although we acknowledge that, under prior precedent, "previous possession of similar contraband by the defendant" is a factor that may be considered in evaluating constructive possession, *see State v. Lucero*, 2015 UT App 120, ¶ 7, 350 P.3d 237, it is important to note that none of our state's previous constructive possession decisions analyzed the rule 404(b) implications of considering "previous possession" in connection with constructive possession. Because an act of previous possession is a prior bad act within the ambit of rule 404(b), we consider it insufficient to simply admit evidence of previous possession in this context, without examining whether a proper non-character purpose exists to support admission of the evidence.

¶41    In this case, none of the potential non-character purposes proffered by the State seem to fit. All of the proffered purposes—knowledge, motive, and intent—seem rooted in a forbidden propensity inference: that because Gallegos previously possessed a shank, he has a propensity to make and keep shanks, and he acted in conformity with that propensity here.

B

¶42    But even if we assume, for the purposes of argument, that in our analysis we are missing some subtle distinction between the State's proffered purposes and the forbidden propensity inference, in our view any such distinction is likely to be lost on

a lay jury, and therefore the prior bad acts evidence has little legitimate probative value, yet comes laden with a substantial risk of unfair prejudice. As noted above, the third step in the analysis is to apply rule 403 of the Utah Rules of Evidence, and assess whether the evidence's probative value is substantially outweighed by the risk of unfair prejudice. *See* Utah R. Evid. 403; *see also State v. Killpack*, 2008 UT 49, ¶ 45, 191 P.3d 17 (describing the third step in the test as an analysis of whether the evidence poses "a danger for unfair prejudice that substantially outweighs its probative value" (quotation simplified)). In our view, even if there exists a non-propensity purpose served by admission of the prior shank evidence in this case, we conclude that the legitimate probative value of any such evidence is substantially outweighed by the near-certainty that the jury will draw the tempting yet forbidden propensity inference.

¶43    When conducting a rule 403 balancing test in this context, where fear of a forbidden propensity inference is present, courts should weigh the evidence's valid non-character purpose "on the probative value side of the ledger," and should weigh the "evidence's value as propensity evidence . . . on the prejudice side of the ledger." *See State v. Fredrick*, 2019 UT App 152, ¶ 45, 450 P.3d 1154 (quotation simplified); *see also United States v. Ballou*, 59 F. Supp. 3d 1038, 1069 (D.N.M. 2014) (determining that, "[w]ith all rule 404(b) evidence," courts must undertake a rule 403 analysis under which they "weigh the licit, probative value of the evidence—meaning the value of the rule 404(b) inference—against the danger of unfair prejudice—which includes the character-propensity inference").

¶44    In this case, the probative value of the prior acts evidence, provided by valid non-propensity purposes, is low. As noted, we cannot readily discern a proper non-character purpose for the admission of this evidence. Moreover, even if we could discern a proper non-character basis to admit this evidence for purposes of demonstrating knowledge, motive, or intent, we

would be forced to confront the fact that those issues were not actively contested at trial. As noted, Gallegos's motive to possess the shank was obvious, and Gallegos did not argue that he had no motive to possess it. And Gallegos's state of mind, in a mens rea sense, was never really at issue; he did not argue that he possessed the shank but did so with a non-culpable mental state. When intent—or knowledge or motive—is "uncontested and readily inferable from other evidence, 404(b) evidence is largely tangential and duplicative." *See Verde*, 2012 UT 60, ¶ 26. In such situations, the prior bad acts evidence—even if it could be said to have a proper non-character purpose—has very little marginal probative value. That is the case here.

¶45 The risk of unfair prejudice presented by the prior acts evidence in this case, by contrast, is high. As we have explained, we are having difficulty discerning any proper non-propensity purpose for admission of this evidence. And if we are having such difficulties, we have no doubt that a lay jury would. The trial court's instruction on this point more or less quoted *State v. Workman*, 2005 UT 66, 122 P.3d 639, and stated that the jury could consider the prior acts evidence "for the limited purpose of" considering "[w]hether there was a sufficient nexus (relationship) between [Gallegos] and the weapon for [the jury] to determine that [he] had both the power and intent to exercise dominion and control" over the shank, but that the evidence was "not admitted to prove a character trait . . . or to show that [Gallegos] acted in a manner consistent with such a trait." *See id.* ¶ 31. It is certainly not obvious to us how evidence that a defendant possessed a weapon on a previous occasion tightens the "nexus" between a defendant and a different weapon found on a later occasion, other than through a propensity inference, and the court gave no further assistance to the jurors to help them understand how—if at all—the permissible purpose was different from the impermissible purpose. In light of the nature of the evidence and the instruction the jury was given, we

consider it all too likely that the jury would have drawn an impermissible propensity inference from this evidence.

¶46 Accordingly, we conclude that any valid probative value that this evidence may have had was limited and ultimately substantially outweighed by the danger of unfair prejudice. We think the best way to sum up this situation is by paraphrasing our supreme court in *Verde*:

> [E]ven if the past misconduct evidence in this case could plausibly be deemed to have been aimed at a legitimate purpose under rule 404(b), it would still fail under the balancing framework required under rule 403. Specifically, and for all the reasons detailed above, we conclude that any legitimate tendency the 404(b) evidence had to tell a narrative of [Gallegos's] specific intent [or knowledge or motive] was minimal at best. And we likewise conclude that any such legitimate purpose is far outweighed by the obvious, illegitimate one of suggesting action in conformity with bad character.

*See Verde*, 2012 UT 60, ¶ 31. Accordingly, we conclude that the trial court exceeded its discretion when it admitted evidence that Gallegos possessed a different shank some four years before the incident in question.

## II

¶47 Gallegos next challenges the trial court's decision to admit evidence that he and Cellmate were members of affiliated gangs, specifically taking issue with the admission of photographs of their tattoos. Gallegos invokes rule 403 of the Utah Rules of Evidence, and asserts that this evidence was unduly prejudicial, and that the risk of unfair prejudice substantially outweighed the evidence's probative value. We disagree.

¶48    Our supreme court has warned trial courts to "view gang-related evidence with caution" before admitting it, because such evidence often carries with it the risk of "potential prejudice of guilt by association." *See State v. Gonzalez*, 2015 UT 10, ¶¶ 37, 40, 345 P.3d 1168 (quotation simplified); *see also State v. High*, 2012 UT App 180, ¶ 26, 282 P.3d 1046 (stating that gang evidence should be viewed "with caution due to the risk that it may carry some unfair prejudice," including potentially leading "the jury to attach a propensity for committing crimes to defendants who are affiliated with gangs or allow its negative feelings towards gangs to influence its verdict" (quotation simplified)). Nevertheless, gang evidence is often admissible. "In the appropriate context, gang evidence has probative value warranting its admission" even "over claims of prejudice." *High*, 2012 UT App 180, ¶ 27 (quotation simplified); *see also Gonzalez*, 2015 UT 10, ¶¶ 37, 40 (stating that "even where gang-related evidence is prejudicial, it is not necessarily *unfairly* prejudicial and therefore should be admitted where it has high probative value," and instructing trial courts that "they may admit [gang-related] evidence when it is introduced for a proper purpose and under the right circumstances").

¶49    In this case, the probative value of the gang-related evidence was high. As the State points out, this evidence provided a motive as to why Gallegos and Cellmate would change their stories about who owned the shank. Even Gallegos acknowledges that the evidence tended to show that the two men "owe[d] a duty of loyalty to one another" that included sometimes "tak[ing] other charges for their fellow gang members," and that at least some gang evidence was "reasonably necessary for the State to try to refute Gallegos's defense that the shank belonged to Cellmate." But Gallegos claims the court admitted too much gang evidence, specifically taking issue with the admission of photographs of Gallegos's and Cellmate's tattoos, asserting that "they were highly prejudicial and not necessary to establish gang affiliation."

¶50 We take Gallegos's point that, after the jury had already learned that the two men were in affiliated gangs that impressed duties of loyalty upon their members, the additional admission of photographs of their tattoos had relatively little (and cumulative) marginal probative value. But it is also true that the admission of the tattoo evidence added relatively little additional risk of unfair prejudice. Gallegos asserts that showing the jury photographs of the tattoos suggested to the jury that it should "reach a decision on an improper basis—that Gallegos was 'inked up' and had a criminal disposition." But the jury already knew that the two men had a criminal history—at the time the shank was discovered, they were sharing a cell in the maximum-security section of the Utah State Prison. Where a piece of evidence has relatively low probative value, but also presents a relatively low risk of unfair prejudice, a trial court does not abuse its discretion by concluding that the risk of unfair prejudice from admitting the evidence does not "substantially outweigh" its probative value. *See* Utah R. Evid. 403; *see also, e.g.*, *State v. Bowden*, 2019 UT App 167, ¶ 22, 452 P.3d 503.

¶51 Accordingly, in this case the trial court did not abuse its discretion in admitting any of the gang evidence proffered by the State, including the photographs of Gallegos's and Cellmate's tattoos.

III

¶52 Next, Gallegos challenges the introduction of evidence related to his and Cellmate's custody and sentencing. In evaluating Gallegos's argument, it is important to distinguish between the two different types of evidence to which this argument refers. First, Gallegos is concerned about evidence regarding the respective sentences Gallegos and Cellmate were serving in prison as of the date the shank was discovered. Second, Gallegos is also referring to evidence regarding the potential sentence Gallegos might receive if convicted of the

charged crime at issue during the trial. During oral argument, Gallegos clarified that his challenge implicates both types of sentencing evidence.

¶53 By pretrial motion, the State sought leave to admit the first type of evidence: information about the length of sentence both men were serving at the time the shank was discovered, as well as their potential eligibility for parole. The State asserted that this evidence went a long way toward explaining why Cellmate—who was in prison serving a sentence of LWOP— might attempt to take the criminal charge for possessing the shank, and why Gallegos—who was eligible for parole and had a hearing coming up—would not want to. The trial court granted the State's motion, and allowed the State to tell the jury about the sentences that Gallegos and Cellmate had been serving at the time the shank was discovered, as well as their parole statuses. During trial, the State presented that evidence through one of the prison investigators, who testified that Cellmate was serving a sentence of LWOP and was therefore not eligible for parole, but that Gallegos was serving a sentence that made him eligible for parole and that, at the time the shank was discovered, he had a parole hearing coming up in ten months.

¶54 The State's pretrial motion contained no request for permission to inform the jury about the potential sentence that Gallegos could serve if convicted of possession of a dangerous weapon by a restricted person—the crime that was the subject of the trial. And the State may not have had any specific intention to present any such evidence. However, as noted, the State did play for the jury audio recordings of phone calls Gallegos made from the prison; it introduced this evidence largely because, during the conversations, Gallegos can be heard explaining the issues with his prison "books," and why he agreed to take responsibility for the shank during the prison disciplinary proceedings. But during two of those phone calls, Gallegos

happens to mention that he has been charged with a first-degree felony that carries a potential sentence of "five-to-life."

¶55    Following the introduction of the audio recordings, the State made no further reference to the "five-to-life" statements, either in questioning witnesses or in making argument. Gallegos, however, mentioned the statements several times. Shortly after the recordings were played for the jury, defense counsel asked the prison investigator to explain what "five-to-life" meant. After the witness explained that it meant that Gallegos "was facing from five years in prison to life" if convicted, counsel asked: "So for this offense, [Gallegos] could serve life in prison?" Then during her closing argument, defense counsel again raised the issue, noting that Gallegos faced "five-to-life" and told the jurors to ask themselves, "Is this justice?," and then offered her view that it was not.

A

¶56    We have no trouble concluding that, in this case, the first type of evidence—information about the sentences Gallegos and Cellmate were serving at the time the shank was discovered, and their parole statuses—was properly admitted. The probative value of that evidence was high: it helped explain why Gallegos and Cellmate might change their stories, once criminal charges were filed against Gallegos, and indicate that the shank belonged to Cellmate. Because Cellmate was serving a sentence of LWOP and was not going to be eligible for parole no matter what, adding another term of years onto his sentence would make no practical difference to him. But because Gallegos had a parole hearing coming up, being convicted of another crime could potentially affect his parole eligibility. And the evidence did not come with much risk of unfair prejudice. Ordinarily, informing a jury of a defendant's or a witness's criminal history might pose a risk of unfair prejudice. *See, e.g.*, *Robinson v. Taylor*, 2015 UT 69, ¶ 40, 356 P.3d 1230 (holding that admission of a

defendant's otherwise irrelevant criminal history unfairly prejudiced the defendant). But here, the jury already knew, due to the nature of the case, that these men were in a maximum-security prison; telling the jury the nature of the sentences they were serving did not add much appreciable risk of unfair prejudice. Accordingly, the court did not abuse its discretion when it granted the State's motion and allowed it to introduce evidence of Gallegos's and Cellmate's sentences and parole statuses, relative to the sentences they were already serving.

B

¶57 We reach a different conclusion, however, with regard to whether the second type of evidence should have been admitted.[5] Ordinarily, a jury considering a defendant's guilt is

---

5. After reviewing the record, we are not at all convinced that Gallegos adequately preserved for our review the specific question of whether the "five-to-life" statements should have been admitted into evidence. Gallegos did not make a specific request that this evidence be excluded; he certainly made no request that the "five-to-life" references be redacted from the audio recordings. Indeed, the State's motion only concerned itself with the first type of sentence/parole status evidence, relating to the sentences Gallegos and Cellmate were already serving, and the court's ruling allowing admission went only to that request. We are therefore not persuaded by Gallegos's contention that his opposition to the State's motion preserved his objection to the "five-to-life" evidence that came in later. But the State does not argue that any part of Gallegos's objection is unpreserved, and has therefore waived the preservation issue. *See State v. Johnson*, 2017 UT 76, ¶ 16, 416 P.3d 443 ("When a party fails to raise and argue an issue on appeal, . . . that issue is waived and will typically not be addressed by the appellate court."). In *Johnson*, the court declined to "address the effect" of

(continued…)

not allowed to hear about or otherwise consider the potential sentence a defendant might face if convicted. *See State v. Cude*, 784 P.2d 1197, 1203 (Utah 1989) (stating that "[p]ossible punishment . . . is usually not a proper matter for jury consideration"); *see also United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990) (stating that "details regarding a defendant's possible punishment are irrelevant to the issues" that a jury considering guilt must decide); Model Utah Jury Instructions 2d, CR215 (2018), https://www.utcourts.gov/resources/muji/ [https://perma.cc/QY8G-9N9H] (instructing juries not to "consider what punishment could result from a verdict of guilty," and that "punishment is not relevant to whether the defendant is guilty or not guilty"). And not only is such evidence irrelevant, it can carry the risk of unfair prejudice, because learning about the potential sentence could cause a jury to be

_____

(…continued)

the interaction between our doctrines of waiver and preservation in instances where a party fails to argue on appeal that its opponent failed to preserve an issue. *Id.* ¶ 17 n.5. More recently, however, our supreme court has indicated that appellate courts have "discretion" in this situation to either "raise a preservation issue on our own initiative when it provides an alternative basis for affirmance," or to "decide to address the matter on appeal despite the lack of preservation." *See State v. Malo*, 2020 UT 42, ¶ 20 n.7, 469 P.3d 982. In this situation, we elect to address the matter despite the apparent lack of preservation; we do so not only because the parties have fully briefed the issue and presented it for our review, but also because we are reversing on the issue of the improperly-admitted shank evidence, and we therefore make an effort to give the parties guidance regarding the sentencing evidence that might be useful on remand. Were we not already reversing for other reasons, we would likely have exercised our discretion differently, for the reasons ably described in the dissent. *See infra* ¶¶ 76–78.

"swayed by [its] sympathetic or antipathetic feelings toward a defendant because of an anticipated sentence." *See Cude*, 784 P.2d at 1203.

¶58 The audio recordings in which the "five-to-life" references were embedded were properly admitted for other purposes, and Gallegos does not argue to the contrary. But those recordings could have served their intended purpose—to show that Gallegos had useless "books" and was using Cellmate's account for purchases, and therefore had incentive to take upon himself all administrative blame for the shank—without the largely extraneous "five-to-life" references. Indeed, those specific portions of the audio recordings could have been redacted without unduly impacting the recordings' evidentiary value. The "five-to-life" references therefore had very low probative value, yet came with significant potential for unfair prejudice.

¶59 The State asserts that the information about the potential "five-to-life" sentence came into evidence more or less inadvertently. In its written motion, the State had not specifically sought to introduce any evidence about the potential sentence facing Gallegos, and the State did not make any further reference to that evidence in support of its case. As the State correctly points out in its brief, "the State's focus in questioning and argument was not on what Gallegos's potential sentence would be, only that it could (or not) delay his [parole] release date." The State also notes that it was Gallegos—and not the State—who later attempted to use the five-to-life information to his advantage, explicitly arguing during closing that the jury should acquit because, among other things, imposing a sentence of five-years-to-life under these circumstances would be unjust.

¶60 But the fact that the State may not have had a specific intent to introduce that evidence does not alter the fact that it should not have been admitted. And we credit Gallegos's argument that, after the "five-to-life" references came in, his

attorney had to make the best of that evidence, *cf. State v. Cruz*, 2016 UT App 234, ¶ 44, 387 P.3d 618 (stating that "once a court has ruled counsel must make the best of the situation"), and therefore attempted to make the best argument about the "five-to-life" references that she could.

¶61 Accordingly, while the first type of sentencing evidence—regarding the sentences Gallegos and Cellmate were already serving—was properly admitted, the second type of sentencing evidence—that Gallegos faced a five-years-to-life sentence for the charged crime—was not.[6] That evidence had little probative value, yet carried with it significant potential for unfair prejudice, and thus was subject to exclusion under rule 403.

IV

¶62 Finally, we must analyze the prejudicial effect of the errors we have identified. "Not every trial error requires reversal." *State v. Klenz*, 2018 UT App 201, ¶ 64, 437 P.3d 504 (quotation simplified). In particular, "[a]ny error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Utah R. Crim. P. 30(a); *see also State v. S.H.*, 2002 UT 118, ¶ 26, 62 P.3d 444 (stating that "an appellate court will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably [a]ffect the likelihood of a different verdict"). Such errors are not reversible unless there is a "reasonable likelihood that the error[s] affected the outcome of the proceedings." *Klenz*, 2018 UT App 201, ¶ 64 (quotation simplified). "A reasonable

---

6. Although we conclude that the evidence should not have been admitted, we take pains to point out that we do not necessarily fault the trial court, which was never specifically asked to exclude the evidence. As noted above, *supra* note 5, this issue may well have been unpreserved.

likelihood requires a probability sufficient to undermine confidence in the outcome." *Id.* (quotation simplified).

¶63 In analyzing the prejudicial effects of improperly admitted evidence, it is often useful to assess the strength of the State's case, both with and without the evidence. *See Cruz*, 2016 UT App 234, ¶ 48 (stating that "when assessing an error's harmfulness, we look, in part, to the overall strength of the State's case" (quotation simplified)). In this case, the State's best evidence was Gallegos's and Cellmate's previous admissions, both the day the shank was discovered as well as during later follow-up interviews and prison disciplinary proceedings, that the shank belonged to Gallegos. At trial, however, Gallegos offered a strong rebuttal to those previous admissions, presenting evidence explaining why his original account was not accurate, including Cellmate's live testimony wherein Cellmate not only testified that both the shank and the shoe in which it was found were solely his, but described in some detail how he had fashioned it from the bed frame. The ultimate question in the case was whether the jury would believe the initial admissions that the shank was Gallegos's, or the later evidence that the shank was Cellmate's.

¶64 In an effort to bolster their respective sides of that question, both the State and Gallegos pointed to evidence tending to corroborate their version of events. Gallegos pointed out that he had good reason to want to falsely accept responsibility for the shank when the only consequence at issue was internal prison discipline, such as fines or different cell assignments, because his "books" were full and both he and Cellmate wanted to keep Cellmate's books clean, and because he was trying to protect Cellmate's ability to be moved out of maximum security and into the general prison population. The State, in contrast, pointed out that Cellmate had every reason to falsely accept responsibility for the shank during the criminal proceedings, because he was serving a sentence of LWOP while

Gallegos was still eligible for parole, and another conviction could hurt his chances of getting paroled.

¶65    In this context, introduction of evidence that Gallegos had previously possessed a similar shank was powerful evidence that may very well have made a difference to the jury's evaluation of which version of events to believe. One indication that this evidence was important was the State's emphasis of it during closing argument, including particular emphasis that the previous shank was very similar to the present shank. *See State v. Ellis*, 2018 UT 2, ¶ 43, 417 P.3d 86 (stating that one factor leading to the conclusion that the admission of the evidence was not harmless was that "[t]he prosecution emphasized this testimony during closing argument"). And during the jury instruction conference, outside the presence of the jury, the State specifically requested that the instructions regarding constructive possession include reference to previous possession, asserting that previous possession was "pretty important" and was "a pretty pertinent element" in this case. Under the circumstances, we agree that the prior shank possession evidence was important, and conclude that there was a reasonable likelihood of a different outcome had that evidence been withheld from the jury's consideration.

¶66    The other piece of improperly admitted evidence—the apparently inadvertent references to "five-to-life"—is less of a concern, and would not have warranted reversal on its own. As noted above, a jury determining whether a defendant is guilty should not consider what punishment might result from a guilty verdict. But in this case, Gallegos's attorney appeared to consider this evidence somewhat helpful, at least in a way, to her client's cause: on several occasions she reminded the jury that the potential sentence was five-years-to-life and expressed her view that such a punishment was out of proportion to the severity of the charged crime. On balance, the amount of prejudice visited upon Gallegos from the improper admission of this piece of evidence was likely slight.

¶67    In the end, we conclude that there is a reasonable likelihood that the outcome of the trial would have been different had the evidence of Gallegos's prior shank possession been excluded. Because our confidence in the outcome of the trial is sufficiently undermined, we must reverse.

CONCLUSION

¶68    The trial court did not abuse its discretion by admitting evidence that Gallegos and Cellmate were in affiliated gangs, including evidence that each of them had adorned their bodies with gang-related tattoos. The court likewise did not abuse its discretion in admitting evidence regarding the sentences that Gallegos and Cellmate were serving at the time the shank was discovered in their shared cell, or their then-current parole statuses. But evidence that Gallegos previously possessed a similar shank should not have been admitted, nor should evidence that the potential sentence upon a guilty verdict in this case was to be "five-to-life." And admission of the previous-shank evidence was not harmless, because there is a reasonable likelihood that, without it, the outcome of the trial would have been different.

¶69    Accordingly, we reverse Gallegos's conviction and remand this case for a new trial.

————————

POHLMAN, Judge (concurring and dissenting):

¶70    I respectfully concur in part and dissent in part.

¶71    I agree with the majority's analysis in Part II concluding that the trial court did not abuse its discretion in admitting gang evidence, including the photographs of Gallegos's and Cellmate's tattoos. I also agree with the majority's analysis in

Part III.A rejecting Gallegos's challenge to the admission of evidence about the respective prison sentences he and Cellmate were serving when the shank was discovered.

¶72    I part ways with my colleagues in their conclusion in Part III.B that evidence of Gallegos's potential sentence was admitted in error. Where Gallegos did not object to the admission of this evidence, I believe we have no grounds on which to reverse.

¶73    I also disagree with the majority's conclusion in Parts I and IV that Gallegos's conviction should be reversed on the basis that the trial court erred in admitting evidence of his prior shank possession. I view questions of admissibility under rule 404(b) as among the most difficult to analyze, and the combination of our precedent and the deferential standard of review leaves me less convinced than my colleagues that the prior shank evidence should have been excluded. But even if I were to agree with the majority's analysis on this issue, I would still affirm Gallegos's conviction. Unlike my colleagues, I do not consider it reasonably likely that the jury would have returned a different verdict had the prior shank evidence not been admitted. And on that basis, I would affirm.

## I. Potential Sentence Evidence

¶74    Gallegos argues that the trial court abused its discretion in allowing for the admission of his statements (on recorded phone calls) that he was facing a "five-to-life" sentence if convicted in this case. The majority begins its analysis on this point by observing that Gallegos did not preserve an objection to the admission of this evidence. *See supra* note 5. I agree with that observation.

¶75    As part of the State's pretrial motion, the State provided Gallegos with a transcript of the excerpts of the audio recordings it intended to introduce at trial so that Gallegos could focus his objection. Gallegos then moved to exclude certain portions of the

recordings, but he lodged no objection to the admission of the "five-to-life" statements. Similarly, Gallegos did not object at trial when the State played the audio recordings of the phone calls in which the "five-to-life" statements could be heard.[7]

¶76    As the majority notes, although the State did not raise the issue of preservation, we have the discretion to reject Gallegos's challenge on that basis. *See supra* note 5 (citing *State v. Malo*, 2020 UT 42, ¶ 20 n.7, 469 P.3d 982). I would exercise that discretion here.

¶77    It is well-settled that "[o]ur adversary system . . . relies generally on objections from parties to police the admissibility of evidence," and "[w]e do not require or even expect our trial judges to exercise their own independent judgment on the question of admissibility." *State v. Hummel*, 2017 UT 19, ¶ 109, 393 P.3d 314. And that, I believe, is why our supreme court has stated that there is "no room for reversal of a trial judge under an abuse of discretion standard on a ground that was not specifically presented to the district court." *State v. Thornton*, 2017

---

7. This appears to have been intentional. The State drew no attention to the "five-to-life" statements, but, as the majority notes, defense counsel drew specific attention to them in cross-examination of the prison investigator and suggested to the jury that justice would not be served if a conviction for being caught with a shank were to lead to such a lengthy sentence. *See supra* ¶¶ 8, 55. The majority suggests that counsel was just making the best of the situation once the evidence came in. *Supra* ¶ 60. But I view it differently. This was not a situation where counsel was surprised by a statement from a live witness or where the court had ruled the evidence admissible over the objection of counsel. If counsel had not wanted the jury to hear the "five-to-life" statements, counsel had every opportunity to seek their exclusion.

UT 9, ¶ 43, 391 P.3d 1016; *see also State v. King*, 2006 UT 3, ¶¶ 23–24, 131 P.3d 202 (finding no abuse of discretion when the trial court did not consider an issue sua sponte).

¶78 Here, the question of the admissibility of the evidence of Gallegos's potential sentence is one we review for abuse of discretion. *See supra* ¶ 11. Because Gallegos did not object to the admission of this evidence, I find no room to conclude that the trial court abused its discretion in not sua sponte excluding this evidence.

## II. Prior Shank Possession Evidence

¶79 As the majority explains, "not every trial error requires reversal." *Supra* ¶ 62 (quotation simplified); *State v. Klenz*, 2018 UT App 201, ¶ 64, 437 P.3d 504. An error in this case would require reversal only if it is reasonably likely that the decision to admit evidence of Gallegos's previous shank possession altered the jury's verdict. *See State v. Kohl*, 2000 UT 35, ¶ 17, 999 P.2d 7 ("We will reverse an erroneous evidentiary ruling only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result for the defendant." (quotation simplified)). I do not think that it did.

¶80 To prove possession in this case, the State advanced the theory that Gallegos constructively possessed the shank. *See generally State v. Workman*, 2005 UT 66, ¶¶ 31–33, 122 P.3d 639 (describing how to prove possession on a constructive possession theory). The State's theory required it to prove that there was "a sufficient nexus" between Gallegos and the shank to permit an inference that he "had both the power and the intent to exercise dominion and control" over the weapon. *See State v. Clark*, 2015 UT App 289, ¶ 14, 363 P.3d 544 (quotation simplified). In meeting its burden, the State did not have to prove that Gallegos possessed the shank to the exclusion of Cellmate. In fact, the State's theory at trial was that "these two men jointly possessed this weapon."

¶81    I believe that even without the prior shank evidence, the State would have easily convicted Gallegos for constructive possession because its case against him was unusually strong.

¶82    To begin with, Gallegos admitted ownership of the shank not once, not twice, but three different times. He claimed ownership on the day it was found in his prison cell; he claimed ownership a few weeks later as part of a prison administrative hearing; and, he again claimed ownership during a subsequent interview with a prison investigator, even identifying where the shank was found. And when asked by the investigator why he had the shank, Gallegos responded, "Uh, we're in prison," and commented, "It's hit or miss, sometimes you guys get me, sometimes you don't." The jury also heard that the shank appeared to have been carved out of the top bunk where Gallegos slept.

¶83    But that's not all. The jury heard testimony that shanks are "pretty common" in the prison and that Gallegos and Cellmate, as members of affiliated gangs, are "supposed to have some sort of weapon with them at all times." A gang expert testified that it is "very common" for gang members to share shanks, explaining that they may have to share "between each other, between cell mates." And consistent with the expert's testimony, Cellmate confirmed for the jury that he and Gallegos would "share stuff."

¶84    The jury also listened to recordings of Gallegos's phone calls in which he discussed the charges against him. Rather than disavowing knowledge of the shank, he explained that he was hopeful the shank possession case against him would "get dismissed," saying, "I already got . . . my little strategy . . . figured out 'cause things played out a certain way." He said, "I got . . . somebody that's taken the . . . puttin' their hand out for it . . . that it was theirs."

¶85 All this evidence points heavily to Gallegos's guilt. And even though Cellmate testified at trial that he made the shank and hid it in his shoe,[8] he also told the jury that he and Gallegos "shared things," and he never claimed that Gallegos was unaware of the shank. That is significant. The State did not need to prove that the shank belonged exclusively to Gallegos. It had to prove only that Gallegos had the power and intent to exercise dominion and control over it. And given Gallegos's multiple admissions, combined with the evidence that Gallegos and Cellmate were prone to share things, including weapons, I have no trouble concluding that the jury would have convicted Gallegos even without the prior possession evidence.

¶86 The majority acknowledges much of this evidence but believes it is reasonably likely that it was the evidence of Gallegos's prior shank possession that swayed the jury toward a conviction. I disagree for several reasons.

¶87 First, while rule 404(b) evidence has the potential to be damaging, evidence of Gallegos's prior shank possession was not particularly revelatory. After all, the jury heard evidence that Gallegos claimed ownership of the shank in *this* case—three different times, on different days, to different people. Thus,

---

8. When asked why he claimed ownership of the shank at trial, after having previously disavowed such ownership, Cellmate responded, "Because it was mine, and I don't feel it's right to have somebody else take the fall for it." As noted above, the jury could have still convicted Gallegos of constructive possession even if it was inclined to believe Cellmate's belated confession. But the jury also had plenty of reason to distrust Cellmate. His claims of concern likely fell on deaf ears after the jury learned that he was in prison for killing three people (and trying to kill a fourth) and had previous convictions for theft by deception and forgery.

hearing evidence that he claimed ownership of a different shank several years earlier was unlikely to carry significant weight.

¶88    Second, in addition to admitting that he possessed the shank found in this case, Gallegos suggested to the prison investigator that he has possessed shanks at other times when he said, "It's hit or miss, sometimes you guys get me, sometimes you don't." This evidence, along with evidence from the gang expert that it was common for gang members to carry and share homemade weapons, blunted the admission of his earlier shank possession.

¶89    Third, the majority says that the State emphasized the prior possession evidence in closing. *See supra* ¶ 65. I read the record differently. It is true that the prosecutor mentioned the prior shank possession in his closing statement. But the State placed no greater emphasis on it than the other evidence pointing to Gallegos's guilt. The State did not treat the prior possession as the centerpiece of its story. Rather, it treated it as just one piece of evidence in a particularly incriminating puzzle.

¶90    Fourth, the trial court gave a limiting instruction on the previous shank possession evidence, advising the jury to consider the evidence for "the limited purpose" of considering whether "there was a sufficient nexus" between the shank and Gallegos and instructing the jury not to convict in this case on the basis that Gallegos may have committed another act at some other time. *See supra* ¶ 6. This instruction further tempered any remaining effect the admission of the prior possession evidence may have had. *See State v. Calvert*, 2017 UT App 212, ¶ 45, 407 P.3d 1098.

¶91    In sum, I would affirm Gallegos's conviction. I see no grounds to conclude that the trial court abused its discretion in not sua sponte excluding the evidence of Gallegos's potential sentence where Gallegos did not object to its admission. And even assuming error in the admission of evidence of the

previous shank possession, I am confident that given the unique evidence in this case, the jury would still have convicted Gallegos without it.

―――――――――