2026 UT App 83

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RAYMOND SHAY,
Appellant.

Opinion
No. 20240257-CA
Filed May 21, 2026

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 181904439

Emily Adams, Freyja Johnson, and
Rachel Phillips Ainscough, Attorneys for Appellant

Derek E. Brown and Daniel L. Day,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGE AMY J. OLIVER concurred. JUDGE RYAN M. HARRIS concurred in part and in the result, with opinion.

CHRISTIANSEN FORSTER, Judge:

¶1 Raymond Shay appeals his convictions on seven counts of aggravated sexual abuse of a child and one count of rape. He argues that the trial court abused its discretion in allowing the State to present testimony regarding sexual abuse allegations asserted by a sibling of the victims in this case. We conclude, however, that the trial court did not abuse its discretion in determining both that this evidence had a proper, non-character purpose and that the probative value of the evidence was not substantially outweighed by a risk of unfair prejudice. We further conclude that even were the evidence improperly admitted, the

admission would have been only harmless error. We therefore affirm Shay's convictions.

BACKGROUND[1]

¶2      In the summer of 2010, Shay became romantically involved with a single mother (Mother) and moved in with her and her five children in their house. Among Mother's children were three daughters: Ashley (age sixteen), Beth (age nine), and Clara (age six or seven).[2]

¶3      The following year, when Ashley was seventeen years old, she alleged that Shay sexually abused her. According to Ashley, the abuse occurred one afternoon when Shay called her into his bedroom and began telling her he was proud of her for certain recent accomplishments and behaviors. Ashley related that Shay "pushed [her] down on the bed," "reached under [her] shirt," and then "put his hands down [her] pants" and touched her vagina.

¶4      The next day, Ashley told Mother about the abuse. Although Ashley initially thought Mother believed her allegations, Mother's subsequent actions and comments suggested otherwise. Mother made Ashley move out of the house that same day, and Mother never took Ashley to the police to report the alleged touching. Mother not only "wouldn't talk to" Ashley, but Ashley was "no longer welcomed in the home," and from Ashley's perspective, "[i]t was basically like [she] never existed." Ashley did, however, report the touching to the police

---

1. "We recite the facts in the light most favorable to the jury's verdict, and we present conflicting evidence as necessary to understand issues raised on appeal." *State v. Black*, 2015 UT App 30, ¶ 2, 344 P.3d 644.

2. We use pseudonyms to refer to the three children.

herself, which eventually resulted in Shay pleading no contest to one count of sexual battery.

¶5 In 2013, Mother and the remaining children moved to an apartment, with Beth and Clara sharing a bedroom. Toward the end of the year, Shay again moved in with the family, and Shay and Mother married the following year. During the years at the apartment, Shay would sometimes, while Mother was away at work, watch scary movies with the children in the dark, and when Beth (then twelve years old) would sit by Shay, he "would lay his hand flat on the couch and then would grab [her] butt[ocks]."

¶6 Also during this same period of time, Beth was diagnosed with arthritis and could find relief from her joint pain only by being massaged. Shay would often massage Beth's legs and hips when Mother was away at work, but he "would also go lower to [her] hips and [her] thighs and get closer to [her] vagina." "Occasionally" during these massages, Shay touched Beth's vagina, sometimes over clothing and sometimes under it. Beth "tried pushing his hand away" because she knew "it was wrong," but Shay "kept pushing his hand even closer." On one occasion, Mother observed Shay massaging Beth's legs and noticed "he was trying to get a little closer to [Beth's] vaginal area," resulting in Beth looking "like she was uncomfortable."

¶7 Shay additionally began asking Beth to "sit on his lap." And when she would do so, he would "move [Beth's] hips around over his penis" such that she could "feel his erection through his pants."

¶8 When Beth was thirteen years old and "had started to develop" breasts, she and Shay "would have tickle fights" together when Mother was not home. During these fights, Shay would squeeze her breasts over her clothing. Shay would also sometimes squeeze Beth's buttocks and breasts when he went into the girls' bedroom either to say goodnight or to say goodbye in the morning.

¶9 Beth did not confront Shay about the inappropriate touching or report it to Mother at this time because she "was scared that [Mother] was not going to believe [her] like she did with [Ashley]."

¶10 During the time that the family was living at the apartment, Shay began to also inappropriately touch Clara, now eleven years old. The abuse started one night when Shay came to the girls' room at bedtime and began rubbing Clara's back but then moved his hand down to rub her buttocks for "a couple minutes." A few nights later, this same activity happened a second time, but this time Clara "tr[ied] to turn over so he would stop" and Shay "started touching [her] vagina over [her] clothes." Then "maybe a week after that" second incident, the same pattern recurred, with Shay rubbing Clara's back and moving down to her buttocks, but this time he "slipped his hand under [her] clothes" and touched both her buttocks and vagina skin-to-skin. Clara again "tr[ied] to turn over hoping he would stop," and Shay removed his hand. Clara remembers this kind of touching happening "a couple times a week" while they lived in the apartment.

¶11 For a few months when Clara was twelve years old, the family moved to live with the girls' grandfather. Shay's inappropriate touching of Clara at bedtime continued there, with Shay sometimes putting "his hand . . . down [Clara's] pants" and "rubbing [her] vagina." Clara did not tell anyone in her family what was happening because she was "scared that no one would believe [her]," similar to what had happened with Ashley.

¶12 Toward the end of 2015, the family then moved to another house. Once they were "settled in" their new house, the pattern of abuse with Clara continued, with Shay touching her under her clothing when he came in at bedtime. But now, Shay additionally "started shoving his fingers inside [Clara's] vagina." Clara remembers this happening "[e]very night" that they lived in that house with Shay.

¶13     One night, when Clara was fourteen years old, the abuse escalated. Clara was in bed trying to fall asleep when Shay entered her bedroom, "took off the blanket," "put [Clara's] legs up on his shoulders," "slid [her] bottoms down," and put "some of his penis" into her vagina. Shay then heard something, causing him to leave, and Mother "caught him coming out of [Clara's] room." Mother asked Shay why he was coming out of the girls' bedroom, and Shay responded that he had been "just checking on" the girls.

¶14     On a different night when Clara was fourteen years old, Mother, who was growing suspicious of Shay, decided to sleep on the floor in the girls' room, with the door locked. During the middle of the night, Shay tried to enter the room and "was banging on the door trying to get in." Mother responded that she was in the room, and Shay eventually left.

¶15     Mother was also uncomfortable when she saw Shay hug Beth and Clara from behind, because she knew that when Shay hugged her that way, he would rub his penis against her, and she was hoping he was not doing the same to the girls. Mother additionally noticed that during this time, Beth and Clara "would try to avoid [Shay] as much as possible."

¶16     Mother eventually kicked Shay out in 2017. A few months later, Beth and Clara started talking with each other about the abuse Shay had been inflicting on them. At first, they "were kind of iffy" about whether they should tell Mother; they were worried that she would not believe them because she had not believed Ashley. But they thought that "if there [were] two of [them]," things might be different, and they wanted to make sure that Mother would not take Shay back again. Beth and Clara told Mother about the abuse, and Mother promptly reported the abuse to the police and took the girls in to be interviewed regarding the abuse.

¶17     For his actions related to Beth and Clara, Shay was ultimately charged with seven counts of aggravated sexual abuse of a child and one count of rape. Before trial, the State provided

notice that it intended to present evidence of "other bad acts" committed by Shay, namely, the "prior sexual offense towards [Ashley]." The State argued that evidence of this conduct was being offered "not in an attempt to portray [Shay] as an individual with a propensity to assault" but, rather, "to establish that [Shay] had a continuing intent and a common scheme to sexually assault these three siblings with whom he had a step-father relationship," that he "knew his behavior with [Beth and Clara] was illegal," and that he had an "intent to commit the crime with which he [was then] charged." Over Shay's objection, the trial court granted the State's motion, concluding that the evidence was "relevant and probative to show intent and a common plan or scheme to engage in sexual contact with three minor siblings" to whom he had been a parental figure. The court also determined that the probative value of the evidence was "not outweighed by any risk of unfair prejudice."

¶18 The case proceeded to trial, with Shay choosing to represent himself with the assistance of standby counsel. The State presented its case largely through the testimony of Beth, Clara, Mother, and Ashley. Shay presented no opening statement, did not cross-examine Mother or the three girls, and did not call any defense witnesses.

¶19 At several points throughout the proceedings, the jury was reminded of the limited purposes for which it could use the evidence regarding Ashley's accusations of abuse. First, during the State's opening statement, the prosecutor previewed Ashley's expected testimony and said,

> Now, you're going to hear from [Ashley] not because the conduct that [Shay] engaged in towards her, the abuse he engaged in towards her isn't charged in this case, but because it shows that this was not a mistake, that this was not an accident, that this was the plan of [Shay], . . . to repeatedly sexually abuse his stepdaughters.

¶20 Second, the trial court provided a specific jury instruction addressing the matter:

> You have heard evidence that the defendant committed an offense against [Ashley] before the acts charged in this case. You may consider this evidence, if at all, for the limited purposes of the defendant's intent, knowledge, and common scheme. Keep in mind that the defendant is on trial for the crimes charged in this case, and for those crimes only. You may not convict the defendant simply because you believe he may have committed some other act at another time.

¶21 Third, during closing argument, the prosecutor again acknowledged, "[T]he conduct that [Shay] did with [Ashley], that's not at issue here. Those are not charged counts. Those are specifically to show that this wasn't an accident and that this was what [Shay's] plan was. This is how he did it."

¶22 Finally, Shay's standby counsel, who gave the majority of Shay's closing argument, told the jury,

> You also heard from [Ashley], but . . . none of the charges have anything to do with her. And to be clear about this, you heard from [Ashley] for very specific reasons; to determine whether there was knowledge, intent, or a common scheme in this case.

> Our law is very clear that we don't allow evidence for what's called propensity. We don't allow evidence of some other act to say, well, because this person did that other act, they probably did this similar act on this occasion. You cannot use what [Ashley] said for that reason.

What it came in for was to show that basically because some of these things could have been sort of incidental, touching, . . . tickle fights that resulted in touching a buttocks or touching a breast or that sort of thing, that this evidence of this other event was intended to show that this wasn't an accident, if it happened. But you cannot say, well, because something similar happened with [Ashley], that makes . . . what [Beth and Clara] said more likely to be true; that you can't do.

¶23 The jury ultimately convicted Shay as charged. He thereafter timely appealed.

ISSUE AND STANDARD OF REVIEW

¶24 Shay argues that the trial court abused its discretion in allowing the State to present testimony of Ashley's sexual abuse allegations under rule 404(b) of the Utah Rules of Evidence. "We review a [trial] court's evidentiary rulings for abuse of discretion. When a [trial] court applies the correct legal standard, its decision to admit or exclude evidence is only an abuse of discretion if it is beyond the limits of reasonability." *State v. Blackwing*, 2025 UT 60, ¶ 16, 582 P.3d 829 (quotation simplified).

ANALYSIS

¶25 Rule 404(b) of the Utah Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, the rule also provides that this same evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). "And rule 404(b)'s use of 'such as' indicates that the

list of non-character purposes is illustrative and not exclusive." *State v. Green*, 2023 UT 10, ¶ 70, 532 P.3d 930 (quotation simplified). Thus, "under rule 404(b), the question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper. If it does[,] then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)." *Id.* ¶ 63 (quotation simplified). *See generally* Utah R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; the Utah Constitution; a statute; or rules applicable in courts of this state."); *id.* R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").[3]

¶26    "The difficulty in applying this simple rule, however, springs from the fact that evidence of prior bad acts often will yield dual inferences—and thus betray both a permissible purpose and an improper one." *State v. Verde*, 2012 UT 60, ¶ 16, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, *and abrogated on other grounds by Green*, 2023 UT 10. In circumstances "where the court concludes that the only real effect of the evidence is to suggest likely action in conformity with bad character," the "avowed proper purpose may be rejected

---

3. Shay argued below that testimony regarding Ashley's sexual abuse allegations was not relevant under rule 402. But on appeal, acknowledging that the rules of evidence "establish a very low bar that deems even evidence with the slightest probative value relevant and presumptively admissible," *State v. Richardson*, 2013 UT 50, ¶ 24, 308 P.3d 526 (quotation simplified), he chose to not develop a rule 402 argument; instead, he focused his appellate argument on asserting that, even "assuming" relevance, this evidence "was not used for a proper purpose" and "was unfairly prejudicial." We therefore do not separately address the trial court's determination as to relevance—a position that the separate opinion also embraces, *see infra* ¶¶ 37–38.

as a pretext or ruse." *Thornton*, 2017 UT 9, ¶ 59 (quotation simplified). "Short of that, however, the court's job under rule 404(b) is not to balance or weigh competing (proper and improper) inferences. Such weighing comes in under rule 403." *Id.* (footnote omitted). Thus, "even if the evidence may sustain both proper and improper inferences under rule 404(b), the court should balance the two against each other under rule 403, excluding the bad acts evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *Verde*, 2012 UT 60, ¶ 18; *see also Green*, 2023 UT 10, ¶ 64 ("In sum, the rules of evidence provide that evidence of prior crimes, uncharged misconduct, or bad acts is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value." (quotation simplified)).

¶27    Applying these rules to the instant case, we do not see that the trial court abused its discretion in determining that the testimony regarding Ashley's allegations was relevant to the proper, non-character purpose of showing Shay's intent, that is, that his touching of Beth and Clara was done with the specific intent to "arouse or gratify [his] sexual desire." Utah Code § 76-5-404.1(2)(a)(ii)(B). This court has previously determined that showing this particular intent is a valid, non-character purpose under rule 404(b).

¶28    One example is *State v. Bair*, 2012 UT App 106, 275 P.3d 1050, wherein the defendant was charged with aggravated sexual abuse of a child after abusing his daughter. *See id.* ¶¶ 2, 4. Prior to the abuse, the defendant had disclosed that he was "addicted to the touchy/feely-play around part of sex," and the State sought admission of that statement under rule 404(b), arguing that the defendant's "admitted addiction demonstrated his intent in touching" his daughter. *Id.* ¶¶ 15, 19 (quotation simplified). The trial court permitted the evidence to be admitted, and the defendant thereafter appealed that decision, "arguing that the [evidence] 'amounted to inadmissible propensity evidence in

disguise.'" *Id.* ¶ 15. This court disagreed, concluding that the defendant's prior disclosure did "provide evidence of [his] specific intent to arouse or gratify his sexual desires, which is a proper, noncharacter purpose under rule 404(b)." *Id.* ¶ 20. And we explained that "even if admission of the [evidence] prompted the jury to infer [the defendant] acted in conformity with his addiction, rule 404(b) permits admission of prior acts evidence so long as the *sole* purpose is not to prove that a defendant acted in conformity with a character trait." *Id.* ¶ 19.

¶29 Likewise, here the State's use of evidence regarding Ashley's allegations of abuse was not an attempt to prove that Shay acted in accordance with a general bad character but was, instead, an effort to provide evidence of Shay's specific intent to seek sexual gratification through sexual contact with his minor stepdaughters. The evidence shows that he targeted his minor stepdaughters who lived in his household, exploited his parental role, initiated abuse in private settings, and relied on secrecy and authority—all as a means to gratify his sexual desires. This is a proper, non-character purpose under rule 404(b), and the trial court therefore did not abuse its discretion in so deciding.[4] *See*

---

4. The trial court did not view the State's purported non-character purpose of intent as a pretext or ruse. Both Shay and the separate opinion argue that this was an abuse of the court's discretion because this case is, like *State v. Verde*, a case in which "intent is uncontested and readily inferable from other evidence." *Verde*, 2012 UT 60, ¶ 26, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, *and abrogated on other grounds by State v. Green*, 2023 UT 10, 532 P.3d 930. For two reasons, we disagree.

First, it is not clear that intent was uncontested here. The only record citation Shay provides for his assertion of uncontested intent is to a statement made in closing wherein he explained that he had been in prison for nine months during the time period given for some of the charged offenses and then said, "*For that*, I think my only defense would be, my argument would be it's

(continued…)

*State v. Burke*, 2011 UT App 168, ¶ 30, 256 P.3d 1102 (recognizing that evidence of multiple acts "is offered for a proper, noncharacter purpose if it is offered to prove intent," and concluding that multiple sexual offenses, "when considered together with the circumstances that connect them, show[ed] that [the defendant] possessed that specific sexual intent at the time each offense was committed").[5]

---

fabricated." (Emphasis added.) And Shay also made another comment in closing that, while not very clear, could arguably be interpreted as contesting intent: "My argument would be through all from Count 1 to 8. Count 1 as it says, stated intentionally, knowingly, recklessly, where No. 3, I touched my daughter. That part I have not—I go against *it too*, Your Honor." (Emphasis added.)

Second, the situation in *Verde* was markedly different than the situation here. There, the defendant not only "offered to stipulate to his intent," but his "intent [was] inferable from proof that [he] groped [the victim's] genitalia" because with such groping, "it's hard to imagine a jury that would conclude that [the defendant] committed the *actus reus* but with an innocent intent." *Id.* ¶ 25. But here, Shay made no concession of intent, and at least some of the alleged touching (i.e. those tied to the massaging and tickle fights) commenced as welcome touching and then allegedly included inappropriate touching—a situation in which there is a possibility that a jury might conclude that the touching happened without the requisite intent.

5. Although the trial court's decision also found the evidence was relevant to the additional non-character purpose of showing "a common plan or scheme," the State concedes on appeal that "the approximate two-year gap between Shay's sexual abuse of [Ashley] and the beginning of the charged crimes likely fails the temporal-proximity requirement necessary to establish a common scheme or plan." We therefore do not evaluate the applicability of this alternate purpose further.

(continued…)

¶30 As to the required rule 403 balancing, "trial courts have wide discretion in determining relevance, probative value, and prejudice. This means that we will not reverse the trial court's [rule] 403 ruling unless we find it was beyond the limits of reasonableness." *State v. Beverly*, 2018 UT 60, ¶ 56, 435 P.3d 160 (quotation simplified); *see also De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 11, 545 P.3d 285 ("Ultimately, as long as the court's decision was within the broad range of discretion entrusted to trial judges, even if we think the trial judge made the wrong call we will affirm because it was, in its essence, a discretionary call." (quotation simplified)); *Burke*, 2011 UT App 168, ¶ 42 ("We must recognize that trial courts are allowed considerable freedom in applying rule 403 to the facts of a case, freedom to make decisions which appellate judges might not make themselves ab initio but will not reverse." (quotation simplified)).

¶31 And we do not see that the trial court abused its wide discretion here. The evidence regarding Ashley's allegations carried substantial probative value by corroborating Beth's and Clara's testimony that Shay intentionally targeted them for sexual gratification. Although there were, admittedly, differences between the events alleged by Ashley and the events alleged by

---

We do, however, note that, although not a purpose highlighted by the trial court, the evidence of Ashley's allegations and the fallout therefrom was relevant to the additional non-character purpose of providing context. The evidence regarding Ashley's allegations explained why Beth and Clara endured abuse for years without telling anyone and explained their fear that they would not be believed—they were afraid that Mother would, like with Ashley, not believe them and that she might react in a similarly unsupportive manner to how she reacted after Ashley's disclosure. Thus, this was yet another non-character purpose that could have been pursued under rule 404(b). *See Thornton*, 2017 UT 9, ¶ 57 (allowing other acts evidence that "presented a narrative of relevance to the prosecution's case," including by "suggesting why [the victim] may have waited to come forward with accusations against [the defendant]").

Beth and Clara, the trial court's assessment was that "[t]here [were] sufficient similarities in conduct between the charged offenses [and] the prior bad acts." *Cf. State v. Green*, 2023 UT 10, ¶ 78, 532 P.3d 930 ("[W]e cannot say that the [trial] court abused its broad discretion in concluding that the similarities among the [victims'] accounts reduced the tendency for the jury to decide upon an improper basis and that the danger of unfair prejudice did not substantially outweigh the evidence's probative value."). Further, the trial court provided the jury with a limiting instruction, specifically listing the reasons for which the jury could consider the evidence regarding Ashley's allegations and also clearly stating, "You may not convict the defendant simply because you believe he may have committed some other act at another time." *See id.* ¶ 80 (recognizing that issuing a limiting instruction could have "a material impact on the rule 403 balancing" (quotation simplified)).

¶32 Based on all this, the trial court did not exceed its wide discretion in determining that the probative value of the other acts evidence was not substantially outweighed by a danger that the jury would base its decision on an improper propensity inference. *See Bair*, 2012 UT App 106, ¶ 22 ("Even if some level of unfair prejudice exists, the mere fact that evidence possesses a tendency to suggest a decision upon an improper basis does not require exclusion; evidence may be excluded only if the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence." (quotation simplified)). Thus, the trial court did not abuse its discretion in allowing the State to present testimony regarding Ashley's prior allegations of abuse.

¶33 Finally, we also agree with the State's assertion that even if the trial court abused its discretion in admitting evidence under rule 404(b), any such error was ultimately harmless. "An erroneous decision to admit or exclude evidence cannot result in reversible error unless the error is harmful." *Green*, 2023 UT 10, ¶ 101 (quotation simplified). "For an error to require reversal, the

likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *Id.* (quotation simplified).

¶34 Beth and Clara each provided largely consistent, detailed testimony of abuse spanning several years. Not only was their testimony mutually corroborative, but it was additionally corroborated by Mother's testimony that Shay seemed to be getting closer to the vaginal area when massaging Beth, that she caught Shay trying to enter the girls' room in the middle of the night, that she was concerned about the manner in which Shay hugged the girls, and that the girls increasingly tried to avoid being around Shay. Further, this evidence went almost entirely unchallenged; Shay chose to proceed pro se at trial and neither offered an opening statement setting forth a defense nor engaged in any cross-examination of Mother or the three girls. Under these circumstances, we are not convinced that had the trial court excluded all evidence regarding Ashley's allegations, there is a reasonable likelihood of a different outcome here. For this additional reason, we affirm Shay's convictions.

CONCLUSION

¶35 The trial court did not abuse its discretion in allowing evidence of prior acts under rule 404(b) of the Utah Rules of Evidence. And even were there any error related to this admission, we would determine it to be only harmless error. We therefore affirm.

————————

HARRIS, Judge (concurring in part and concurring in the result):

¶36 I join Paragraphs 33 and 34 of the lead opinion, and I concur in the result reached by the majority: that Shay's convictions should be affirmed. But I reach that conclusion largely by way of very different reasoning than the lead opinion does, and I write separately to explain that reasoning, an

endeavor that requires me to set forth some concerns I have with our supreme court's decision in *State v. Green*, 2023 UT 10, 532 P.3d 930.

¶37 The issue in this case is whether the trial court erred by overruling Shay's objection to Ashley's testimony that—when she was seventeen, and several years before he sexually abused Beth and Clara—Shay sexually abused her too. This testimony thus constitutes "prior-bad-acts evidence," the admissibility of which is governed by rule 404(b) of the Utah Rules of Evidence. Under Utah law, "such evidence is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value." *State v. Gallegos*, 2020 UT App 162, ¶ 15, 479 P.3d 631 (quotation simplified). The first step is not contested here: Shay at least tacitly acknowledges that Ashley's testimony is "relevant," as that term has been defined in our law. *See id.* ¶ 16 (noting that the relevance inquiry "presents a low bar" (quotation simplified)); *see also State v. Murphy*, 2019 UT App 64, ¶ 47, 441 P.3d 787 (Harris, J., concurring) (noting that prior-bad-acts evidence is presumptively excluded by our rules "not because it has no appreciable probative value, but because it has too much" (quotation simplified)).

¶38 It is thus the final two steps that are contested here: that is, Shay asserts that there is no proper non-character purpose for admission of Ashley's testimony and that (in any event) the danger of unfair prejudice substantially outweighs any legitimate probative value Ashley's testimony might have. On these points, I part ways with the lead opinion. In my view, no proper non-character purpose was articulated to the trial court that would justify admission of Ashley's testimony in this case. And I also believe, under the circumstances, that the bulk of Ashley's testimony had extremely low *legitimate* probative value and that any such value was substantially outweighed by the risk of unfair prejudice, namely, the risk that the jury would draw a forbidden propensity inference. For these reasons, and as further explained below, in my view the trial court exceeded its discretion

by overruling Shay's objection to the entirety of Ashley's testimony.

¶39 But I nevertheless agree that Shay's convictions should be affirmed because, on this record, the trial court's error was harmless. In a counterfactual trial in which Ashley did not testify, Shay enjoys no reasonable likelihood of a different outcome. On this basis, I join Paragraphs 33 and 34 of, and concur in the result reached by, the lead opinion.

## I. Non-Character Purpose

¶40 Under our evidentiary rules, "the admissibility of prior misconduct evidence depends on its avowed purpose." *State v. Verde*, 2012 UT 60, ¶ 15, 296 P.3d 673, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, *and abrogated on other grounds by State v. Green*, 2023 UT 10, 532 P.3d 930. Our rules forbid the introduction of prior-bad-acts evidence "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). "This forbidden line of thinking is sometimes referred to as a 'propensity inference'—that is, if jurors are told that a person has acted in a certain way on previous occasions, they may conclude that it is in that person's character to act that way, and may conclude that, due to this propensity, the person was much more likely to have acted in conformity with that propensity on the occasion in question." *Gallegos*, 2020 UT App 162, ¶ 13; *see also Verde*, 2012 UT 60, ¶ 15 (stating that, when prior-bad-acts evidence "is offered to suggest action in conformity with a person's alleged bad character, it is inadmissible").

¶41 But while prior-bad-acts evidence is not admissible under rule 404(b) to prove propensity, "that rule allows admission of evidence of such acts for other purposes." *Gallegos*, 2020 UT App 162, ¶ 14. Under the rule, prior-bad-acts evidence "may be admissible" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Utah R. Evid. 404(b)(2). Thus, "when past misconduct

evidence is offered for any other purpose—other than to suggest action in conformity with the bad character suggested by [a defendant's] prior bad acts—such evidence is admissible so long as it satisfies rules 402 and 403." *Thornton*, 2017 UT 9, ¶ 36 (quotation simplified); *see also Verde*, 2012 UT 60, ¶ 15 ("So long as the evidence is not aimed at suggesting action in conformity with bad character, it is admissible under rule 404(b).").

¶42 But "evidence of prior bad acts often will yield dual inferences—and thus betray both a permissible purpose and an improper one." *Verde*, 2012 UT 60, ¶ 16. And in such cases, it may be difficult for "the court to differentiate the two inferences or to limit the impact of the evidence to the purpose permitted under the rule." *Id.* Accordingly, our supreme court has instructed lower courts to look closely at whether the evidence at issue "is *genuinely* being offered for a proper, non-character purpose, or whether it might actually be aimed at sustaining an improper inference of action in conformity with a person's bad character." *Id.* ¶ 18 (emphasis added). "If such evidence is really aimed at establishing a defendant's propensity to commit crime, it should be excluded despite a proffered (but unpersuasive) legitimate purpose." *Id.* ¶ 17 (quotation simplified). We must therefore examine the purposes proffered by the State (and by the lead opinion) for admission of Ashley's testimony and consider whether those purposes are genuine.

¶43 When this issue first arose at the trial court level, the State's initial position was that there were many proper non-character purposes for Ashley's testimony. Specifically, it asserted that Ashley's testimony was admissible to show "motive, intent, knowledge, absence of mistake, lack of accident and common scheme." During briefing and argument in the trial court, the number of potential non-character purposes was whittled down, with the court eventually settling on two, ruling that Ashley's "testimony [was] relevant and probative to show *intent* and a *common plan or scheme* to engage in sexual contact with three minor siblings with [Shay as] the step-father or step-father figure." (Emphasis added.)

¶44 In defending against Shay's appellate arguments, however, the State has further refined its position, abandoning any argument that "common plan or scheme" is a proper non-character purpose in this case. It does, however, defend the trial court's ruling that *intent* functions as such in this case. And it also argues, as an alternative ground for affirmance, that rebuttal of Shay's fabrication defense—Shay argued at trial that Beth and Clara were untruthful or mistaken in accusing him of abuse—is a proper non-character purpose justifying admission of Ashley's testimony. Then, on its own, the lead opinion suggests a third proposed non-character purpose, one not mentioned by the trial court or argued as such by the State on appeal: that Ashley's testimony is "relevant to the additional non-character purpose of providing context." *Supra* note 5.

¶45 In my view, none of these arguments is persuasive enough, either as a matter of logic or as a matter of interpretation of our rules of evidence, to justify admission of the entirety of Ashley's testimony. I discuss each in turn.

A. Intent

¶46 "Intent" is indeed one of the purposes listed in rule 404(b) as a potentially proper non-character purpose. But to gain admission of prior-bad-acts evidence on the basis of intent, it is not enough for the proponent of the evidence to merely incant the word "intent." Rather, that party must demonstrate that the evidence is truly being admitted to prove intent and is not being offered merely as cover for a back-door propensity inference. As our supreme court put it, "if proof of intent is merely a ruse, and the real effect of prior misconduct evidence is to suggest a defendant's action in conformity with alleged bad character, the ruse is insufficient and the evidence should not be admitted." *Verde*, 2012 UT 60, ¶ 22.

¶47 In particular, the *Verde* court repudiated the "not-guilty rule," under which it was thought that, as long as a defendant pled not guilty to the charged offense, the defendant thereby put

his state of mind at issue. *Id.* ¶¶ 21–24. The court called the not-guilty rule "an undisciplined substitute for careful analysis under rule 404(b)," and it held that "the technical relevance of evidence of a defendant's intent is not enough to justify the admissibility of evidence of prior bad acts purportedly aimed at establishing intent." *Id.* ¶¶ 22–23. Instead, the court instructed lower courts to "evaluate the true purpose" of proffered prior-bad-acts evidence, despite the existence of a not-guilty plea. *Id.* ¶ 24. And in engaging in that same exercise in *Verde*, the court found it highly relevant that the defendant "did not contest intent at trial." *Id.* ¶ 25. Indeed, the court stated that "[w]here intent is uncontested and readily inferable from other evidence, [prior-bad-acts] evidence is largely tangential and duplicative." *Id.* ¶ 26. On the facts of *Verde*, where the defendant was not contesting intent, the court held that "it seems much more likely that [the prior-bad-acts evidence] was aimed at sustaining an impermissible inference that [the defendant] acted in conformity with the bad character." *Id.*[6]

¶48     Like the defendant in *Verde*, Shay did not contest the intent element of the charged crimes in this case. In *Verde*, the defendant put forth as his "primary defense" the argument that "he never touched [the complaining witness's] genitalia" at all. *Id.* ¶ 25. Likewise here, Shay describes his defense as that "he *did not* touch [Beth] and [Clara]" at all, "*not* that he touched them by mistake or without the requisite intent." The State agrees that this was Shay's main defense, acknowledging (as discussed more fully below) that Shay raised a "fabrication" defense. Thus, just as in *Verde*, in this case the intent element was "uncontested and readily inferable from other evidence." *Id.* ¶ 26. And that is a good clue that the true motive for offering the evidence is not to establish

_____

6. The main case upon which the lead opinion relies in this context—*State v. Bair*, 2012 UT App 106, 275 P.3d 1050—came out several months before *Verde*, and it must give way to *Verde* to the extent the two opinions conflict. *See Mathena v. Vanderhorst*, 2020 UT App 104, ¶ 12 n.2, 469 P.3d 1144 ("We are bound by vertical stare decisis to follow strictly the decisions rendered by the Utah Supreme Court." (quotation simplified)).

intent but, instead, to invite the jury to draw a forbidden propensity inference. *See id.*

¶49   My conclusion in this regard is further bolstered by the manner in which the State, in its appellate brief, characterizes this ostensible "intent" purpose. While the State uses slightly different language at various points in its brief, its descriptions (with our emphasis) are enough to give the game away:

- Ashley's testimony "served the proper non-character purpose of proving Shay's specific intent to seek sexual gratification through his *unusual predilections for his minor stepdaughters*."

- Ashley's testimony "had the unique non-character purpose of proving Shay's specific intent to sexually gratify himself through his *unusual motivations to force quasi-incestuous relationships with his minor stepdaughters*."

- Ashley's testimony was "admitted for the proper, non-character purpose of establishing Shay's intent and motivations—his *unusual predilections toward seeking sexual gratification from his future or current minor stepdaughters*."

- Shay had a "*core pattern* of exploiting his parental role when Mother was not around to sexually abuse three minor stepdaughters."

¶50   Thus, taking the State's description of its proffered purpose at face value, it is apparent that the State wanted to admit Ashley's testimony—primarily if not exclusively—to invite the jury to draw a forbidden propensity inference, namely, that Shay was the type of person who had a propensity to sexually abuse young girls in his care and that he acted in conformity with that character in abusing Beth and Clara. On this record, I conclude that the State's

assertion that Ashley's testimony operated to show Shay's intent was "merely a ruse" and that "the real effect" of the testimony was "to suggest" a propensity inference. *See id.* ¶ 22. In my view, the court erred, on this record, by concluding that "intent" was a proper non-character purpose for admitting Ashley's testimony.

B.      Rebuttal of Fabrication

¶51    Perhaps recognizing the infirmities in its "intent" arguments, the State shifts gears and invites us to affirm the trial court's ruling regarding non-character purpose on an alternative ground. Specifically, the State asserts that because Shay raised a fabrication defense—asserting that Beth and Clara were either lying or mistaken—Ashley's testimony was admissible, under *State v. Green*, 2023 UT 10, 532 P.3d 930, to further the purpose of rebutting that fabrication defense.

¶52    The State correctly observes that, in *Green*, our supreme court did indeed hold that rebuttal of a fabrication defense constituted a valid non-character purpose for the admission of prior-bad-acts evidence. *See id.* ¶ 71. The State also correctly observes that Shay was running a fabrication/mistake defense in this case, in that he was asking the jury to disbelieve the testimony from Beth and Clara. And the State correctly observes that, had *Green* been decided prior to the trial court's ruling in this case, the State would almost certainly have argued—based on *Green*—that Ashley's testimony should be admitted to further the purpose of rebutting that defense. And given *Green*'s analysis and holding, the State would have had a very strong argument in that regard.

¶53    But for the reasons stated below, I do not think we can affirm on this alternative basis, because—given the deferential standard of review we apply in this context—the trial court should have the first crack at deciding whether Ashley's testimony should be admitted pursuant to the rebuttal-of-fabrication purpose. *See State v. Dowhaniuk*, 2025 UT App 100, ¶ 31, 574 P.3d 1000 (declining to affirm on an alternative ground because that ground involved a determination that "should

ordinarily be made in the first instance by the [trial] court"). At best, the State's argument about rebuttal of fabrication represents something it could raise on remand, if the case were remanded.

¶54    However, even aside from the procedural problem of affirming, right now, on the State's proffered alternative ground, I have reservations about the reasoning our supreme court employed in *Green* in reaching its holding that rebuttal of fabrication counts as a valid non-character purpose in this context. I recognize, of course, that I am bound to follow our supreme court's holding in *Green*. But I nevertheless choose to take this opportunity—as I have done on other occasions in this same space, *see State v. Lane*, 2019 UT App 86, ¶¶ 36–50, 444 P.3d 553 (Harris, J., concurring); *State v. Murphy*, 2019 UT App 64, ¶¶ 45–65, 441 P.3d 787 (Harris, J., concurring)—to express my view, for whatever it might be worth, "that the governing law might warrant re-examination in a future case." *See Murphy*, 2019 UT App 64, ¶ 45 (Harris, J., concurring).

\* \* \* \*

¶55    In *Green*, our supreme court finally did away with the doctrine of chances, a legal doctrine against which I have, on a few occasions, leveled some criticism. *See Lane*, 2019 UT App 86, ¶¶ 36–50 (Harris, J., concurring); *Murphy*, 2019 UT App 64, ¶¶ 45–65 (Harris, J., concurring). I had been critical of the doctrine of chances because, in my view, it was a metaphysical mess and quite confusing for lower courts, not to mention lay juries, to make any sense of. And I was critical of the doctrine not only because it found no support in the text of the Utah Rules of Evidence, but also because it served to materially undermine the overarching reason for rule 404(b)'s existence: the ban on propensity evidence. I noted that there may well be excellent policy-based reasons to change our evidentiary rules to allow admission of propensity evidence, at least in certain cases, and that—for instance—the Federal Rules of Evidence had been so amended to allow such evidence in all sexual assault and child molestation cases. *See Murphy*, 2019 UT App 64, ¶¶ 49, 65 (Harris,

J., concurring); *see also* Fed. R. Evid. 413(a) ("In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault."). But my overall point was that, if we as a society believe that propensity evidence should be admitted either generally or in certain types of cases, we should be straightforward about it and amend our rules of evidence to textually allow for that outcome, rather than continuing to profess fealty to rules that include a propensity ban while at the same time inventing legal doctrines that function as a contra-textual end run around that same ban. *See Murphy*, 2019 UT App 64, ¶ 65.

¶56　In *Green*, our supreme court overruled its doctrine-of-chances cases for precisely these reasons: the court stated that the doctrine had "been difficult to apply in practice" and determined that the doctrine's "requirements deviate[d] from the plain text of the rules of evidence." 2023 UT 10, ¶ 49. I agree wholeheartedly with this assessment, and I do not mourn the passing of Utah's doctrine-of-chances jurisprudence.

¶57　But the *Green* court put something else in its place that is, in my view, equally erroneous and suffers from some of the same flaws as the doctrine-of-chances jurisprudence did. Indeed, the new regime continues to perpetuate the central problem that I identified with the doctrine of chances: it mouths fealty to the propensity ban, *see id.* ¶ 63 (noting "that the rule deems" a "propensity purpose" "improper" (quotation simplified)), while just as—perhaps even more—effectively removing all practical limitations to admission of prior-bad-acts evidence. Again, removing these limitations may be a perfectly acceptable policy outcome; indeed, this outcome was achieved years ago with regard to child molestation cases. *See* Utah R. Evid. 404(c). And this outcome was achieved just this year, by legislative amendment, with regard to all other sexual assault cases. *See id.* R. 404(d)(2) ("In a criminal case in which a defendant is accused of sexual assault, the court may admit evidence that the defendant committed any other acts of sexual assault. This evidence may be considered on any matter to which the evidence

is relevant, including to prove a propensity to commit the crime charged.").[7]

¶58     But the way to properly enact such a policy is to change the text of the rule—as occurred with rule 404(c) and, more recently, with rule 404(d)—and not to continue to interpret the existing rule (which still contains a propensity ban) in ways incompatible with its text. And the fact that the court put this new regime into place in an opinion professing to utilize a "plain text" formulation of the rule makes the whole thing even stranger. In my view, the court's "plain text" analysis runs aground very quickly on the second element of the three-part test for admissibility of prior-bad-acts evidence—the one in which courts must analyze and identify a purported proper non-character purpose for admission of the prior-bad-acts evidence.

¶59     The purpose for which the State offered the prior-bad-acts evidence in *Green* was for "rebutting" the defendant's claims that all six complaining witnesses were "fabricating" their allegations of sexual assault. *See* 2023 UT 10, ¶¶ 66–67. The main problem with the court's "plain text" analysis is one it was candid enough to acknowledge: this purpose—rebuttal of a defendant's fabrication defense—is not listed in the text of rule 404(b)(2). *See id.* ¶ 70 (noting that "[t]he list of enumerated purposes . . . does

---

7. *See also* Joint Resolution Amending Rules of Evidence Concerning Crimes or Other Acts, S.J.R. 001, 2026 Leg., Gen. Sess. (Utah 2026). As noted again in note 11 below, this amendment—whether one agrees with it or not—has the salutary benefit of making our law in this area much more intellectually consistent. And, at least as to sexual assault cases, this amendment moots much of my criticism of *Green* as set forth herein. But the *Green* regime is still in place as applied to this case—that is, no party argues that the 2026 rule amendment applies to this case—and the *Green* regime is still in place in cases that do not fall into either the sexual-assault or child-molestation categories. *See, e.g.*, *State v. Lane*, 2019 UT App 86, 444 P.3d 553 (an example of a case in which prior-bad-acts evidence was used in a non-sex-crime case).

not include the rebuttal of fabrication"). To be sure, the rule does contain a list of potential purposes for which prior-bad-acts evidence might plausibly be offered, and this list is expressly non-exhaustive. *See* Utah R. Evid. 404(b)(2) (stating that prior-bad-acts evidence "may be admissible for" purposes other than proving propensity, "*such as* proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" (emphasis added)). While the rule's language—especially the words "such as"—provides textual support for the *general* proposition that non-character purposes other than those specifically listed in the rule might exist, it provides no textual support for the *specific* proposition that "rebuttal of fabrication" is properly considered one of them.

¶60 Against this backdrop, it is worthwhile to take a moment to examine the *Green* court's rationale for concluding that "rebuttal of fabrication" constitutes a proper non-character purpose. The court's analysis on this point is, in the end, rather spare and is contained entirely within one paragraph. The court begins by stating that "the plain text of the rule, in conjunction with the other rules of evidence, *suggests* that [prior-bad-acts] evidence may be admissible to rebut a fabrication defense," *Green*, 2023 UT 10, ¶ 70 (emphasis added); the court's use of the verb "suggests" is telling and itself suggests that the text of the rule might not be quite as "plain" as the court describes. As substantive support for its analysis, the court then proffers that the rules of evidence are intended to support "an inclusionary approach to admitting evidence under rule 404(b)," *see id.*—thus quickly resolving, in a couple sentences and while citing only the rules themselves, a complex historical debate about the reach of rule 404(b), *see Murphy*, 2019 UT App 64, ¶ 48 n.16 (Harris, J., concurring) (describing the long debate over whether federal rule 404(b) is a rule of inclusion or a rule of exclusion)[8]—and points

---

8. *See also* Dora W. Klein, *"Rule of Inclusion" Confusion*, 58 San Diego L. Rev. 379, 415 (2021) (classifying as "substantively misleading" the notion that "the whole of [r]ule 404(b) [is] 'a rule

(continued…)

out that "rule 404(b)'s use of 'such as' indicates that the list of non-character purposes is illustrative and not exclusive," *see Green*, 2023 UT 10, ¶ 70 (quotation simplified). But again, while these two things do constitute support for the notion that purposes other than the ones listed in rule 404(b)(2) might theoretically exist, these things do not, in my view, constitute support—textual or otherwise—for the specific proposition that "rebuttal of fabrication" is one such purpose. To the contrary, they operate to bring into sharp relief the absence of textual support for the court's specific conclusion.

¶61    To recap: the court's "plain text" syllogism is as follows:

*Major premise*:    Rule 404(b) is inclusionary.

*Minor premise*:    Rule 404(b)(2)'s list of non-character purposes is illustrative and not exclusive.

*Ergo*:    "Rebuttal of fabrication" is a proper non-character purpose.

Even as a non-plain-text argument, this syllogism is questionable. It offers no limiting principles—textual or otherwise—on what can be considered a proper non-character purpose under rule 404(b)(2). Indeed, this logic applies just as well to *literally anything* (other than propensity—including the doctrine of chances) as it does to "rebuttal of fabrication," and it throws the door wide open to consideration of any non-propensity label a creative lawyer can think to put on prior-bad-acts evidence. Moreover, it does not for a moment consider whether any new unenumerated non-character purpose is likely to invite jurors to draw a propensity

---

of inclusion,'" and noting, for instance, the Ninth Circuit's recent attempt to more accurately characterize rule 404(b) by not describing "the whole of [r]ule 404(b) as 'a rule of inclusion'" but by stating that the rule has an "exclusionary purpose" in subsection (1) and an "inclusionary structure" in subsection (2)).

inference, or the extent to which the new purpose might be at odds with rule 404(b)(1)'s propensity ban.

¶62 But when the modifier "plain text" is placed on it, the syllogism's flaws become even more apparent. The *Green* court identified no actual textual support—in any of the rules of evidence, and certainly not in rule 404(b)—for the specific proposition that "rebuttal of fabrication" is a proper non-propensity purpose for admission of prior-bad-acts evidence. And I submit that there is a very good reason that the text of the rule contains no such support: because the drafters of the rule likely understood that including "rebuttal of fabrication" in the list of acceptable rule 404(b)(2) purposes would operate to effectively eliminate the propensity ban that is rule 404(b)'s raison d'être. After all, the plain text of the rule *does* quite plainly support the concept of a ban on propensity evidence. *See* Utah R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."). And our supreme court has long observed that rule 404(b) contains a propensity ban. *See, e.g.*, *State v. Lucero*, 2014 UT 15, ¶ 14, 328 P.3d 841 (cautioning that, under rule 404(b), "evidence may be admitted despite its negative propensity inference, but if such evidence is really aimed at establishing a defendant's propensity to commit crime, it should be excluded" (quotation simplified)), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730 (stating that evidence offered under rule 404(b) must be "offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged"). Even the court in *Green* professed continuing fealty to this principle. *See* 2023 UT 10, ¶ 63 (noting "the propensity purpose that the rule deems improper" (quotation simplified)).

¶63 But here's the rub: you can't have anything approaching a functional ban on propensity evidence if you let prior-bad-acts evidence come in for the purpose of rebutting a fabrication defense. In *Green*, the court noted that the prior-bad-acts evidence

was "highly probative of the primary issue at trial—whether the complaining witness is fabricating her allegation of sexual assault." *Id.* ¶ 67. But *of course* the prior-bad-acts evidence is probative of this: if five other witnesses take the witness stand, one after another, and swear, under oath, that the defendant sexually assaulted them in similar ways, jurors are going to be much less likely to believe that the complaining witness is lying than they would have been if they had only heard the complaining witness testify. We must, however, ask *why* this is so.

¶64 The *reason* jurors are less likely to believe a fabrication defense after hearing six witnesses testify similarly is that, as a result of hearing that testimony, they are *more* likely to believe that the defendant is the type of person who would commit this sort of crime. They disbelieve the fabrication defense precisely because they come to espouse a propensity theory. *See Murphy*, 2019 UT App 64, ¶¶ 57–59 (Harris, J., concurring) (quoting a law review article (citation omitted) that observed that "each separate accusation would have no bearing upon the accuracy of another allegation but for the conclusion that the multiple accusations demonstrate a cross-situational pattern of behavior, which is but a variation on the taboo inference of a general propensity or character trait"); *see also* 23 Stephen A. Hess, Colorado Practice § 413:3 (2025) (discussing a Colorado statute that allows prior-bad-acts evidence to be admitted, in sex crimes cases, for the purpose of rebutting a fabrication defense, and stating that this asserted "'non-propensity' justification has a tendency to swallow the [propensity ban] completely" because, after presentation of prior-bad-acts evidence for this purpose, "one can hardly avoid reasoning directly from the defendant's propensity to commit such crimes: the victim is telling the truth because the defendant has done this sort of thing before"). Rebuttal of a fabrication defense is thus nothing more—and, crucially, nothing less—than the reverse side of the same logical coin as propensity evidence. A litigant who is offering prior-bad-acts evidence for the avowed purpose of rebutting a fabrication defense is, in most cases, simply offering propensity evidence cloaked under a different label.

¶65 Our supreme court's conclusion in *Green*—that rebuttal of fabrication is a proper non-character purpose under rule 404(b)(2)—thus represents, for all practical purposes and in the absence of a robust rule 403 inquiry, *see infra* Part II, the end of the propensity ban in Utah. In the vast majority of criminal cases (including this one), defendants defend cases, at least in part, by asserting that the complaining witness should not be believed because he or she is lying or is at least mistaken. Only the most uncreative prosecutors will be unable to spin heretofore-inadmissible prior-bad-acts evidence as information that will, at least to some extent, rebut a claim that the complaining witness should not be believed. And district courts, with the *Green* opinion in hand, will be compelled to conclude that—despite the obvious propensity inference jurors are likely to draw—the evidence has a proper non-character reason for admission.

¶66 In short, the court's conclusion in *Green*—that rebuttal of fabrication is a proper non-character purpose under rule 404(b)(2)—is not specifically supported by anything in the text of our rules of evidence, and in fact operates to eviscerate the main purpose of rule 404(b), the ban on propensity evidence (which *is* apparent in the rule's text). As I see it, the court in *Green*, applying an analysis consistent with the text of the rule, should have concluded that rebuttal of fabrication is not a proper non-propensity purpose under rule 404(b).

C.      Context

¶67 The third potential purpose to be discussed here is "context." The State makes no argument that "context" is a proper non-character purpose that would satisfy the *second* element of the relevant test. *See State v. Gallegos*, 2020 UT App 162, ¶ 15, 479 P.3d 631 (noting that prior-bad-acts evidence "is admissible if it (1) is relevant to, (2) a proper, non-character purpose, and (3) does not pose a danger for unfair prejudice that substantially outweighs its probative value" (quotation simplified)). To be sure, the State in its brief does mention "context," asserting that "Ashley's testimony was essential context for explaining [Beth's] and

[Clara's] significant delay in reporting the abuse." But the State makes this argument as part of its rule 403 analysis—the *third* element of the relevant test. I discuss this argument, in that context, below. *See infra* ¶¶ 88–90.

¶68 But the lead opinion uproots the State's rule 403 argument about "context" and transplants it into entirely different soil, suggesting that "providing context" can function as a proper non-character purpose for admitting prior-bad-acts evidence. *See supra* note 5. In so doing, the lead opinion acknowledges that "providing context" was "not a purpose highlighted by the trial court." *Supra* note 5. And as noted, not even the State asks us to take this step in this case.

¶69 There are several procedural problems with the lead opinion's suggestion. First and foremost, we should be extremely cautious about deciding a case on the basis of an argument not discussed by the trial court and not advanced or briefed by any party. *See State v. Johnson*, 2017 UT 76, ¶ 40, 416 P.3d 443 ("Any time a judge raises an otherwise overlooked or unargued issue, the judge arguably undertakes an advocacy role to some extent, as it is the parties' duties to raise and argue the issues."). There are exceptions to the general rule that, "if a party has not raised an issue on appeal, an appellate court may not consider the issue sua sponte." *Id.* ¶ 48 (quotation simplified). But the lead opinion does not explain whether, or how, any of those exceptions are applicable here. *See id.* ¶¶ 49–52 (discussing exceptions).

¶70 Second, the trial court did not consider the possibility that "providing context" might be a potential non-character purpose in this case, and therefore it did not include discussion of that potential purpose in the instruction it gave to the jury about Ashley's testimony. *See supra* ¶ 20 (quoting the jury instruction). Stated another way, the jury had no idea that Ashley's testimony could be, or was being, admitted for that purpose and, thus, was unlikely to have so considered it. A jury instruction discussing this purpose may have actually been helpful, because jurors are

much more likely to be able to conceptually distinguish between these two purposes (considering the evidence only for purposes of explaining delayed disclosure, on the one hand, and considering the evidence for propensity, on the other) than they are to be able to distinguish between propensity and rebuttal-of-fabrication. *See infra* ¶¶ 79, 81.

¶71 And third, because the trial court did not consider the "context" argument, it had no opportunity to undertake the analysis required by our supreme court in *Verde*, and assess whether the evidence at issue "is genuinely being offered for a proper, non-character purpose, or whether it might actually be aimed at sustaining an improper inference of action in conformity with a person's bad character." *See* 2012 UT 60, ¶ 18. And in this same vein, as discussed below in connection with the rule 403 analysis, the trial court had no opportunity to consider whether Ashley's testimony—if truly admitted for "context" purposes and not for propensity purposes—might warrant being limited (for instance, by permitting Ashley to state simply that Mother did not believe her when she accused Shay of improper behavior, but not allowing testimony detailing the actual behavior).

¶72 I readily concede that, in some cases, prior-bad-acts evidence may be admissible for some contextual purposes. *See State v. Thornton*, 2017 UT 9, ¶ 57, 391 P.3d 1016. Inquiries of this sort will inevitably be highly factual in nature and will depend on the circumstances of each case. In this case, the trial court did not identify "context" as a potential non-character purpose for admission of Ashley's testimony, and given the procedural problems I identify, I do not think we can, on this record, affirm the trial court's analysis concerning the second step of the test—articulating a proper non-character purpose—on the alternative basis that the lead opinion sua sponte suggests.

\* \* \* \*

¶73 Accordingly, I do not think we can affirm the trial court's determination that there exists a proper non-character purpose for

Ashley's testimony in this case. The trial court erred by concluding that this testimony could come in to prove Shay's intent. Rebuttal of fabrication can—under *Green*, even as much as I don't like it—constitute a proper non-character purpose, and so can context, but the State did not make those arguments at the trial court level and the trial court therefore did not have an opportunity to exercise its discretion regarding those arguments and, for that reason, affirmance (as opposed to remand) on those alternative grounds is inappropriate.

## II. Rule 403 Balancing

¶74    If there were a proper non-character purpose for admitting Ashley's testimony in this case, the next step would be to assess whether the legitimate probative value of that testimony is substantially outweighed by the risk of unfair prejudice. For the reasons discussed, I think the risk of unfair prejudice posed by the entirety of Ashley's testimony—the risk that the jury would draw the forbidden propensity inference—substantially outweighs the *legitimate* probative value of that evidence.

¶75    My criticism of *Green* is not limited to its analysis of whether rebuttal of fabrication constitutes a proper non-character purpose for admission of prior-bad-acts evidence: I think *Green* made errors in how it applied rule 403 as well.

¶76    A proper rule 403 analysis, in this context—where fear of a forbidden propensity inference is present—consists of weighing the prior-bad-acts evidence's "valid non-character purpose on the probative value side of the ledger," and weighing "the evidence's value as propensity evidence on the prejudice side of the ledger." *State v. Gallegos*, 2020 UT App 162, ¶ 43, 479 P.3d 631 (quotation simplified). Indeed, in its last major rule 404(b) case before *Green*, our supreme court laid it out exactly that way:

> The district court needed to identify the likely inferences the jury would draw from the other-acts evidence and then ask if the evidence's probative

value (the jury drawing a permissible inference) was substantially outweighed by the danger of unfair prejudice (the jury drawing an impermissible inference). If the district court were to conclude that the jury is substantially more likely to rely on an impermissible inference, the evidence must be excluded under rule 403.

*State v. Richins*, 2021 UT 50, ¶ 103, 496 P.3d 158.

¶77　Even assuming, for purposes of this part of the discussion, that "intent" or "rebuttal of fabrication" or "context" could somehow constitute a proper non-propensity purpose for admission of the entirety of Ashley's testimony in this case, a proper rule 403 analysis involves comparing the value of that evidence for the *proper* purpose—here, intent or rebuttal of fabrication or context—with the danger that the jury would draw an impermissible inference—here, propensity. *See id.* ¶ 104 (determining, in that case, that "[t]he risk of the jury making a character-based inference substantially outweigh[ed] the probative value of the other-acts evidence").

¶78　In perhaps the most puzzling passage of its opinion in *Green*, our supreme court refused to apply the rule 403 analysis the way it had in *Richins*, stating that its "review in [*Richins* had been] conducted under the doctrine-of-chances framework" and was "therefore less relevant" because that doctrine had been abolished (in *Green* itself). *See Green*, 2023 UT 10, ¶ 75. But the court did not explain why its rule 403 analysis—presumably, weighing the permissible inference against the impermissible one—would be any different in a doctrine-of-chances case than in a non-doctrine-of-chances case. After all, one of the commonly claimed purposes for admitting evidence under the doctrine of chances was for rebuttal of fabrication. *See, e.g., Verde*, 2012 UT 60, ¶¶ 44–62; *Murphy*, 2019 UT App 64, ¶¶ 56–59 (Harris, J., concurring). So the rule 403 balancing test—comparing the probative value of the evidence submitted for "rebuttal of fabrication" against the potential risk that the jury would draw an

impermissible propensity inference—should be exactly the same in the doctrine-of-chances context as it is outside that context. Yet the *Green* court—on its own account—did not engage in any comparison of the relative value and prejudice risk of the two competing purposes; instead, it merely noted, almost in passing, that the trial court had done such a comparison and had determined that "the danger of unfair prejudice [was] slight." 2023 UT 10, ¶ 76.

¶79   In my view, the court should have applied the same rule 403 analysis it applied in *Richins*, and had it done so, it likely would have reached the same result it reached there: that the evidence's low *legitimate* probative value was substantially outweighed by the risk that the jury would draw the forbidden propensity inference. Even law-trained judges and attorneys, let alone lay jurors, have the devil's own time sussing out any distinction between evidence coming in to rebut fabrication and evidence coming in for a propensity purpose. I submit that this is because the two purposes functionally and logically amount to the same thing. Just as in *Richins*, in the *Green* case there was, in my view, an extremely high risk that the jurors would draw an improper propensity inference after hearing all six witnesses testify. And for the reasons already discussed, the evidence had minimal *permissible* probative value, because the bulk of its persuasive value—which is admittedly a lot—comes because the jury was likely to draw the impermissible propensity inference. Again, jurors tend to disbelieve a defendant's fabrication defense precisely because, after hearing multiple witnesses tell a similar story, they tend to draw a propensity inference. Just as in *Richins*, "[t]he risk of the jury making a character-based inference" should have been deemed to "substantially outweigh[] the [permissible] probative value of the other-acts evidence." *See* 2021 UT 50, ¶ 104.

¶80   Moreover, in support of its rule 403 analysis in *Green*, the court noted that the stories told by the six witnesses were strikingly similar, and it credited the trial court's reasoning that, "given the similarities among the women's accounts, . . . it was unlikely that a jury would find the evidence in one woman's case

to be lacking but find the evidence in another woman's case compelling enough to deliver a verdict on an improper basis." *See* 2023 UT 10, ¶ 77. As a threshold matter, I must confess that I am not sure I can follow that reasoning; at a minimum, I cannot discern how that reasoning does not simply collapse into an impermissible propensity inference. But more to the point here, the trial court in *Green*—prior to the issuance of the supreme court's *Green* opinion, and at a time when the doctrine of chances was robust—was considering the "similarity" of the six charged crimes only because that was one of the four foundational elements of the now-abolished doctrine-of-chances analysis; our supreme court, in *Green*, did not explain why it rejected *Richins*'s rule 403 framework because it was rooted in that now-abolished doctrine, but relied on the trial court's similarity analysis that was rooted in that same doctrine. In reality, the similarity inquiry once required by the court's doctrine-of-chances jurisprudence is now completely vestigial—not to mention that it is, and always was, devoid of support in the text of rule 404(b)—whereas a rule 403 analysis is still required; the court should have therefore adopted *Richins*'s rule 403 framework and discounted the trial court's similarity analysis, not done the opposite. And in addition, viewing the *similarity* of the witnesses' accounts as something that weighs *in favor* of admissibility under a proper rule 403 analysis is, in the propensity-ban context (although not in the rule 404(c) and (d) context[9]), precisely the wrong way to look at it. The more

---

9. The situation is, of course, different when the prior-bad-acts evidence is properly admitted to prove propensity, as occurs in child molestation and sexual assault cases. In those situations, courts examine the similarities and differences between the prior-bad-acts evidence and the charged crime, and they generally conclude that when the similarities are strong and the differences slight, the evidence has higher probative value and lower risk of unfair prejudice. *See, e.g.*, *State v. Alvarado-Rodriguez*, 2026 UT App 25, ¶¶ 21–22, 587 P.3d 47, *petition for cert. filed*, Apr. 17, 2026 (No. 20260455). But this is because, in rule 404(c) and (d) cases, the prior-bad-acts evidence is properly admitted to prove propensity.

(continued…)

similar the prior bad acts are to the charged crime, the more likely—not less likely—jurors are to draw a forbidden propensity inference and conclude that the defendant is just the sort of person to commit precisely this sort of crime. *See State v. Modes*, 2020 UT App 136, ¶ 18, 475 P.3d 153 ("[T]he more similar a previous act is to the act the defendant is accused of committing, the more commission of a previous act might suggest propensity.").

¶81 Finally, our supreme court in *Green* took some comfort—for purposes of its rule 403 analysis—in a "limiting instruction" the trial court gave to the jury. *See* 2023 UT 10, ¶ 80. But that instruction was, in my view, nowhere near as helpful as the court seemed to assume. It told jurors that they could consider the prior-bad-acts evidence, if at all, "for the limited purpose of determining" whether the complaining witnesses "fabricated [their] accusation[s]," but that they could not consider the evidence "to show that [the defendant] has a general criminal propensity, or to prove a character trait of the defendant, or to show that he acted in a manner consistent with such a trait." *Id.* ¶¶ 80, 91, 93–95. But as noted above, I am not at all convinced that

---

Stated another way, in rule 404(c) and (d) cases, propensity is a proper purpose for admission of the evidence, and it therefore weighs on the *probative* side of the rule 403 ledger. *See State v. Fredrick*, 2019 UT App 152, ¶ 45, 450 P.3d 1154. But in rule 404(b) cases, where propensity is *not* a proper purpose, "the evidence's value as propensity evidence should be weighed on the 'prejudice' side of the ledger." *Id.* On at least one occasion, we have noted the confusing role of "similarity" in a rule 403 analysis in the rule 404(b) context. *See State v. Simpson*, 2025 UT App 32, ¶ 44, 566 P.3d 756 ("Utah's courts have considered similarity in relation to both the probative value prong of rule 403 and its unfair prejudice prong."), *cert. denied*, 578 P.3d 748 (Utah 2025). But in my view, when conducting a rule 403 analysis in the rule 404(b) context, strong similarities between the prior-bad-acts evidence and the charged crime—which lead inexorably toward a propensity inference—should not be viewed as positively for admission purposes as they were by the court in *Green*.

even a law-trained human brain is capable of distinguishing between these two purposes: they are essentially two sides of the same coin. Our supreme court, in *Richins*, made this same point. *See* 2021 UT 50, ¶ 53 (acknowledging the "substantial degree of mental discipline" required of a jury when it is asked "to consider a defendant's past acts to assess whether his [or her] accuser is making up the allegations, but to simultaneously not consider whether the fact that the defendant has committed the prior acts means he [or she] has a propensity to commit those crimes"). Yet in *Green*, without really explaining why, the court changed its tune and now apparently views this type of confusing instruction as somehow comforting. I see no reason for this change of direction; like the *Richins* court, I view such instructions, when offered in the rebuttal-of-fabrication context, as extremely unlikely to materially reduce the risk that a lay juror will draw an impermissible propensity inference from prior-bad-acts evidence.

¶82    In short, the risk of unfair prejudice—from jurors drawing a still-impermissible propensity inference—was extremely high in *Green*, as it will be in any case in which prior-bad-acts evidence is offered for the purpose of rebutting a fabrication defense. Jurors were all but certain to draw a propensity inference after hearing multiple witnesses give similar accounts on the witness stand. To the extent that prior-bad-acts evidence helps rebut a defendant's fabrication defense, this likely occurs precisely because the jurors come to espouse the forbidden propensity inference, and not for any non-propensity reason. Because the risk of jurors drawing an impermissible inference substantially outweighs any *permissible* probative value that the prior-bad-acts evidence might have, a rule 403 analysis, correctly undertaken, should have come out in *Green* in favor of exclusion of the prior-bad-acts evidence.

* * * *

¶83    After *Green*, then, it is unclear to me what a rule 403 analysis in a rule 404(b) prior-bad-acts case is supposed to look like. Is it supposed to look like what the court laid out in *Richins*, where the evidence's *legitimate* probative value is weighed against

the risk of the jury drawing an *illegitimate* propensity inference? Or is it supposed to look like what the court laid out in *Green*, which is decidedly less robust? Indeed, under *Green*, proponents of the admission of prior-bad-acts evidence can now apparently meet their rule 403 burden by simply demonstrating that the prior bad acts are similar to the charged crime and by persuading the trial judge to give an incomprehensible limiting instruction.

¶84 As applied to this case, if *Green* sets the rule 403 standard, then the trial court did not abuse its discretion in determining that Ashley's testimony passed rule 403 muster. The events Ashley described were similar to the events Beth and Clara described, and the court did instruct jurors that they could consider Ashley's testimony "for the limited purposes of [Shay's] intent, knowledge, and common scheme," but that they could not vote to "convict [Shay] simply because [they] believe[d] he may have committed some other act at another time." This was good enough under *Green*, and I am bound to follow *Green*, so I suppose that must be good enough here.

¶85 But it shouldn't be. Under what I consider to be a proper rule 403 analysis—the one our supreme court outlined in *Richins*—Ashley's testimony does not pass rule 403 muster, regardless of whether the proper non-character purpose is considered to be intent or rebuttal of fabrication.

¶86 Regarding intent, the evidence's probative value is very limited because intent was never contested at trial. Our supreme court made this exact point in *Verde*, when it held as follows:

> [E]ven if the past misconduct evidence in this case could plausibly be deemed to have been aimed at a legitimate purpose under rule 404(b), it would still fail under the balancing framework required under rule 403. Specifically, and for all the reasons detailed above, we conclude that any legitimate tendency the [rule] 404(b) evidence had to tell a narrative of [the defendant's] specific intent was minimal at best.

> And we likewise conclude that any such legitimate purpose is far outweighed by the obvious, illegitimate one of suggesting action in conformity with bad character.

2012 UT 60, ¶ 31. And we made that same point in *Gallegos*. *See* 2020 UT App 162, ¶¶ 44–46.

¶87 Regarding rebuttal of fabrication, as I've already noted, the risk of unfair prejudice is extremely high because all humans—especially non-law-trained jurors—have a difficult time ascertaining any difference between considering evidence for rebuttal of fabrication and considering evidence for propensity. Our supreme court understood this very well in *Richins*, when it concluded that prior-bad-acts evidence proffered for rebuttal-of-fabrication purposes did not pass muster under rule 403. In that case, the court articulated its reasoning like this:

> Under [a rebuttal of fabrication] articulation, there is a little, but only a little, more room between the permissible and impermissible inference. The non-propensity-based inference is that because [the defendant] had been accused of similar behavior on four prior occasions, it is unlikely that [the complaining witness] fabricated a story that closely matched the other accusations. The impermissible inference is the same as before—because [the defendant] did this type of thing before, he did it this time. But even in this posture, the risk of the jury resorting to the impermissible inference overwhelms the possibility that the jury will confine itself to focusing on the probability of fabrication. Stated differently, we have no confidence that, having [been] told . . . that [the defendant] engaged in this behavior previously, the jury would do anything other than indulge the inference rule 404(b) exists to prevent.

*Richins*, 2021 UT 50, ¶ 105. To be sure, the court's rule 403 analysis in *Richins* was undertaken in the doctrine-of-chances context, and that doctrine has now been abolished. But the proffered non-character purpose in *Richins* was rebuttal of fabrication, and (as I've already noted) the rule 403 analysis should have been exactly the same in *Green* as it was in *Richins*, and it should be the same here. We are assessing the evidence's probative value for demonstrating a rebuttal of fabrication, and we are weighing that probative value against the risk that the jury might draw the forbidden propensity inference. When done correctly, in *Richins*, the result was exclusion under rule 403. And that same result should obtain here, as regards rebuttal of fabrication.

¶88 Finally, regarding the lead opinion's suggestion that "context" could have provided a proper non-character purpose, the rule 403 analysis is somewhat more nuanced, and for that reason should be conducted by the trial court in the first instance. As the State suggests, there is appreciable probative value in Ashley's testimony as "context for explaining [Beth's] and [Clara's] significant delay in reporting the abuse." The State is entitled to present evidence—which, at the State's election, in many cases includes a blind expert witness—to discuss reasons for delayed disclosure, and the fact that Mother didn't initially believe Ashley's allegations is a fact that does serve to explain the girls' delayed disclosure.

¶89 But a proper rule 403 balancing assessment should include consideration of potential limitations on Ashley's testimony, designed to ensure that Ashley's testimony comes in *only* for the proper purpose and not for the forbidden propensity purpose. For instance, if Ashley's testimony were coming in only for this limited "context" purpose, it would likely suffice for the jury to learn that Ashley made unspecified allegations of improper touching against Shay and that Mother didn't initially believe Ashley. Many of the additional details contained in Ashley's testimony—such as the number of and details of the events in question, and whether Shay eventually pled guilty to any crime—

are far less relevant to the purported proper purpose and are far more likely to trigger a propensity inference among jurors.

¶90    In summary, I do not think the rule 403 balancing test—properly conducted—comes out in the State's favor regarding the intent or rebuttal-of-fabrication purposes. And because "context" was never suggested to the trial court as a potential proper purpose, the trial court never got an opportunity to weigh the probative value of that evidence against the potential risk of unfair prejudice from an improper propensity inference.

### III.  Harmless Error

¶91    Despite my serious concerns with both Utah's rule 404(b) jurisprudence and the trial court's analysis in this case, I nevertheless believe that Shay's convictions should be affirmed, because even assuming that admission of Ashley's testimony was erroneous, any error was harmless on the specific facts of this case.

¶92    "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also State v. Cesspooch*, 2024 UT App 15, ¶ 14, 544 P.3d 1046 (stating that, in this context, we must "ask[] whether we remain confident that the verdict would be the same had the improper information been excluded" (quotation simplified)); *State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (quotation simplified)).

¶93    The lead opinion ably explains why any error in admitting Ashley's testimony was harmless on the facts of this case. Beth and Clara offered testimony that was detailed, consistent, and

"mutually corroborative."[10] *Supra* ¶ 34. And their accounts were also at least partially corroborated by Mother, who witnessed Shay massaging Beth in ways she felt might be inappropriate, and who (on one occasion) caught Shay leaving Clara's room during the night and (on another occasion) trying to enter the girls' room during the night. These facts represent strong evidence in support of conviction.

¶94    In addition, Shay didn't offer much of a defense. He chose to represent himself at trial (assisted by standby counsel), and he presented no opening statement, called no witnesses, and opted not to cross-examine Mother or either of the complaining witnesses. Thus, the counterfactual trial that we must envision is one in which Ashley does not testify but in which Shay again represents himself and again chooses not to give an opening statement, call witnesses, or cross-examine Mother or the two complaining witnesses. There is simply no reasonable likelihood that, in this counterfactual trial, Shay would enjoy a different outcome than the one he received the first time.

CONCLUSION

¶95    In *Green*, our supreme court abolished the doctrine of chances. And that's a good thing, from my point of view. But in many ways, *Green* leaves our law no better off, and no more textually consistent, than it was before. We still have rules of evidence—and case law—professing allegiance to the historical ban on propensity evidence. But those rules mean even less than they used to, because after *Green* it is arguably even easier for litigants—often the prosecution in criminal cases—to obtain

---

10. Shay does not argue that there should have been separate trials regarding Beth and Clara, and he makes no argument that the same jury should have been prevented from hearing both girls' accounts.

admission of prior-bad-acts evidence despite the rules' presumptive ban on propensity evidence.

¶96    Under our supreme court's prior precedents, "[a] charge of fabrication [was] insufficient by itself to open the door to evidence of any and all prior bad acts." *See Verde*, 2012 UT 60, ¶ 55. That appears to no longer be the case, at least functionally. Now, a prosecutor's effort to rebut a defendant's fabrication defense is considered to be a proper non-propensity reason for admission of prior-bad-acts evidence. And, judging by the analysis in *Green*, prosecutors can now apparently meet their rule 403 burden by simply demonstrating that the prior bad acts are similar to the charged crime and by persuading the trial judge to give a confusing limiting instruction.

¶97    It is therefore hard to read *Green* as anything other than the functional elimination of the ban on propensity evidence in Utah, in all factual contexts. Depending on one's point of view, this may or may not be a positive development. But in any event, we thus find ourselves in more or less the same place we were in during the doctrine-of-chances regime, when I lamented that "we routinely allow character evidence to reach the jury while maintaining the pious fiction that we follow the character evidence rule." *See Murphy*, 2019 UT App 64, ¶ 65 (Harris, J., concurring) (quotation simplified). In my view, there needs to be either (a) an amendment to the rules that expands admissibility of propensity evidence to all contexts (not just child molestation and sexual assault cases) or (b) a reconsideration of *Green* (without a resurrection of the doctrine of chances) to functionally restore the propensity ban (at least in non-child-molestation and non-sexual-assault contexts).[11] As I said in *Murphy*, the question of which one

---

11. As noted above in note 7, the 2026 amendment to rule 404—regardless of what one might think of its merits—is a meaningful step in the direction of intellectual consistency. But the problems I identify here will still exist, going forward, in all cases *except* child molestation cases and sexual assault cases. And that group of cases is hardly a null set.

of these "divergent pathways" to adopt is one that remains "above my pay grade." *Id.* It took us more than a decade to rid ourselves of the doctrine of chances. I hope it doesn't take us another decade to fix, in one way or another, this latest misstep.

¶98 Despite my reservations about *Green*, I am bound to follow it. In my view, it does not compel affirmance in this case, because the trial court was not asked to weigh in on the rebuttal-of-fabrication theory (or on the "context" theory) and was not given an opportunity to exercise its discretion in deciding whether to admit the contested evidence on those grounds. I am, however, able to vote with my colleagues to affirm Shay's convictions, but I do so on harmless error grounds, because I believe that in a hypothetical counterfactual trial that did not contain Ashley's testimony, there is no reasonable probability of a different outcome for Shay.

—————